# No. 22-3205(L)
## No. 23-50 (CON)

## United States Court of Appeals
## for the Second Circuit

———

**Jodi Rouviere, individually,**

**Plaintiff-Appellant,**

**Andre Rouviere, Jodi Rouviere's husband, individually,**

**Plaintiff,**

**vs.**

**Howmedica Osteonics Corporation, DBA Stryker Orthopaedics, Inc.,**

**Defendants-Appellees.**

——————

On Appeal from the United States District Court for the
Southern District of New York (The Honorable Lewis J. Liman)

### <u>BRIEF FOR PLAINTIFF-APPELLANT</u>

Jodi Rouviere
10950 Southwest 84th Court
Miami, FL 33156-3526
(305)608-8076
jodi.jtm@gmail.com
*Appearing Pro se*

# TABLE OF CONTENTS

Page(s):

TABLE OF AUTHORITIES……………………………………………… iv

INTRODUCTION ....................................................................... 1

JURISDICTIONAL STATEMENT…………………………………… 5

STATEMENT OF THE ISSUES.................................................. 6

STATEMENT OF THE CASE .................................................... 6

I.     FACTS…………………………………………………………7

II.    PROCEDURAL HISTORY……………………………………21

III.   STANDARD OF REVIEW……………………………………22

ARGUMENT ............................................................................ 23

POINT I.    **District court erred in granting Depuy's motion for summary judgment……………………………………... 24**

   1. Rouviere's objection to the Magistrate Judge's Order Striking Parts of the Jarrell Report Was Timely………………….....24

   2. Magistrate judge's orders striking portion of report and opinion of Rouviere's expert were clearly erroneous, abuse of discretion or contrary to law…………………………………………..27

   3. Deficient warnings by DePuy proximately caused Jodi Rouviere's injuries; granting summary judgment in favor of DePuy was contrary to clearly established law …………………………………………..37

   4. Different warnings or adequate warnings would have led Rouviere's surgeon Dr. Buly not to use the components at issue and not recommend to Rouviere to use Appellees' hip implants…………………...39

ii

**TABLE OF CONTENTS (conti…)**

**Page(s):**

**POINT II.  District court erred in granting Stryker's motion for summary judgment**……………………………………… 44

1. Appellant's claims are time-barred by New York's 3-year personal injury statute of limitations……………………………… 45

2. District court erred Appellees should not be equitably estopped from claiming action was untimely due to its egregious and extreme fraudulent misrepresentations about nature of product by Appellees……………………………………………….. 54

3. District court erred in finding that Appellant's claims for implied and express warranties were time-barred…………………….65

CONCLUSION ....................................................................... 68

CERTIFICATE OF COMPLIANCE…………………………………… 69

CERTIFICATE OF SERVICE…………………………………………… 70

# TABLE OF AUTHORITIES

Page(s)

**CASES**

Adickes v. S.H. Kress and Co.,
398 U.S. 144, 157 (1970)……………………………………………….. 62

Altria Client Servs. LLC v. R.J. Reynolds Vapor Co.,
2022 U.S. Dist. LEXIS 124411 (M.D. N.C. 2022)…………………… 34

Bano v. Union Carbide Corp.,
361 F.3d 696 (2d Cir. 2004)……………………………………………… 50

Braune v. Abbott Lab..,
895 F. Supp. 530, 556 (E.D.N.Y. 1995)………………………………... 52,53

Byrd v. Blue Ridge Rural Elec. Coop.,
356 U.S. 525 (1958)……………………………………………….. 53

Cergua v. Stryker Corp.,
2012 WL 5506119 (S.D.N.Y. 2012)……………………………….. 47

Chauffeurs, Teamsters Helpers, Local No. 391 v. Terry,
494 U.S. 558 (1990)……………………………………………….. 53

Coene v. 3M Co.,
303 F.R.D. 32 (W.D.N.Y. 2014)……….……………………………. 36

Companhia Energetica Potiguar v. Caterpillar Inc.,
2016 U.S. Dist. LEXIS 201020 (S.D. Fla. 2016)…………………..... 35

Davis v. Armstrong Relocation, LLC,
2007 U.S. Dist. LEXIS 62399 (M.D. Ala. Aug. 23, 2007)……………. 26

Dimick v. Schiedt,
293 U.S. 474 (1935)…………………………………………………. 53

Doninger v. Niehoff,
642 F.3d 334, 344 (2d Cir. 2011)…………………………………… 22

## TABLE OF AUTHORITIES (conti…)

**Page(s)**

## CASES

*Enright v. Eli Lilly & Co.*,
77 N.Y.2d 377 (1991)…………………………………………….. 50

*Equal Employment Opportunity Commission v.
Venator Group Specialty, Inc.*,
2001 U.S. Dist. LEXIS 2506 (S.D.N.Y. March 12, 2001)……………. 26

*Erbe v Lincoln Rochester Trust Co.*,
13 A.D.2d 211 (1961)………………………………………… 54

*Fisher v. Bristol-Myers Squibb Co.*,
181 F.R.D. 365,370 (N.D.Ill.1998)…………………………. 65

*Gabelli v. SEC*,
568 U.S. 442, 450 (2013)……………………………………… 63

*General Stencils v. Chiappa*,
18 N.Y.2d 125 (1966)………………………………………….. 54

*Gianakakos v. Commodore Home Sys.*,
285 A.D.2d 907 (Supreme Ct. 3d Dept 2001)………………………… 66,67

*Graham v. City of New York,*
2010 U.S. Dist. LEXIS 78184 (S.D. N.Y. 2010)………………… 25

*Harper v. Ercole*,
648 F.3d 132 (2d Cir. 2011)……………………………….. 62

*Harris v. Ostrout*,
65 F.3d 912 (11th Cir. 1995)……………………………… 1

*Hawes v. Macy's Stores West, Inc.*,
2022 U.S. Dist. LEXIS 11861 (S.D. Oh 2022)……………………… 34

*Holdridge v. Heyer-Schulte Corp. of Santa Barbara*,
440 F. Supp. 1088 (N.D.N.Y. 1977)……………………………. 67

## TABLE OF AUTHORITIES (conti…)

**Cases:**                                                                    **Page(s):**

*Houston v. Cotter*,
7 F. Supp. 3d 283 (E.D.N.Y. 2014)…………………………………………..54

*In re Scrap Metal*,
527 F.3d 517 (6th Cir. 2008)……………………………………………… 35

*In re Zimmer*,
2021 U.S. Dist. LEXIS 72049 (S.D.N.Y. 2021)……………………………. 36

*Int'l Design Concepts, LLC v. Saks, Inc.*,
486 F. Supp. 2d 229 (S.D.N.Y. 2007) …………………….……… 66

*Krogmann v. Glens Falls City School Dist.*,
231 A.D.2d 76, 78, 661 N.Y.S.2d 82 (3d Dep't 1997)…………………….. 51

*Lab Crafters, Inc. v. Flow Safe, Inc.*,
2007 U.S. Dist. LEXIS 99079 (Oct. 26, 2007)……………………………. 36

*Levine v. Philip Morris, Inc.*,
5 Misc.3d 1004(A), 798 N.Y.S.2d 710 (Sup. Ct. N.Y. Cnty 2004)…………..51

*Lincoln Nat. Life Ins. Co. v. Transamerica Financial Ins. Co.*,
2010 WL 3892860 (N.D. Ind. Sept. 30, 2010)………………………………..32

*Martin v. 159 West 80 Street Corp.*,
3 A.D.3d 439, 440, 770 N.Y.S.2d 720 (1st Dep't 2004)………………………51

*Matter of New York County DES Litig.*,
89 N.Y.2d 506 (1997)………………………………..………………………..51

*McCornack v. Actavis Totowa*, LLC,
2011 U.S. Dist. LEXIS 76607 (S.D.W.Va. July 14, 2011)…………………..26

*Mira v. Kingston*,
218 F. Supp. 3d 229 (S.D.N.Y. 2016)…………………..………………. 62

# TABLE OF AUTHORITIES (conti…)

**Cases:**                                                                 **Page(s):**

*Mitchell v. Ford Motor Co.*,
318 Fed. Appx. 821 (11th Cir. 2009)……………………………………………35

*Norex Petroleum Ltd. v. Access Indus.*,
2003 U.S. Dist. LEXIS 13725 (S.D. N.Y. 2003)……………………………….25

*Noyola v. Johnson & Johnson*,
1986 WL 14657 (N.D.Ill. Dec. 16, 1986)……………………………………….65

*Partminer Worldwide Inc. v. Siliconexpert Techs. Inc.*,
2011 U.S. Dist. LEXIS 157997 (D. Colo. Feb. 9, 2011) ……………………26

*Patterson v. Balsamico*,
440 F.3d 104, 117 (2d Cir. 2006)…………………………………………..   33

*Pearl v. City of Long Beach*,
296 F.3d 76 (2d Cir. 2002)………………………………………………   63

*Port Auth. of N. Y. & N.J. v. Allied Corp.*,
914 F. Supp. 960 (S.D.N.Y. 1995)………………………………………..  66

*Prego v. City of New York*,
141 Misc.2d 709, 534 N.Y.S.2d 95 (1988)………………….……………  50

*Rekor Sys. Inc. v. Loughlin*,
2022 U.S. Dist. LEXIS 102829 (S.D.N.Y. June 8, 2022)…………………   36

*Roeder v. J.P Morgan Chase & Co.*,
523 F. Supp.3d 601, 620 (S.D.N.Y. 2021)……………………………….   64

*RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*,
2023 U.S. Dist. LEXIS 61730 (E.D.N.Y. 2023)…………………………   36

*Sarkees v. E. I. Dupont De Nemours & Co.*,
15 F.4th 584 (2d Cir. 2021)………………………………………………   23

**TABLE OF AUTHORITIES (conti…)**

**Cases:** **Page(s):**

*Scheidel v. A.C. & S., Inc.*,
258 A.D.2d 751, 753, 685 N.Y.S.2d 829 (3d Dept. 1999)…………………. 51

*Scherrer v. Time Equities,*
218 A.D.2d 116, 634 N.Y.S.2d 680 (1995)………………………………. 54

*Simler v. Conner,*
372 U.S. 221 (1963)……………………………………………………. 53

*Smith v. Bell,*
2011 U.S. Dist. LEXIS 9743 (E.D. Tex. Feb. 1, 2011)…………………... 26

*Somoza v. N.Y.C. Dep't of Educ.*,
538 F.3d 106, 112 (2d Cir. 2008)………………………………………… 22

*Sotomayor v. City of New York,*
713 F.3d 163, 164 (2d Cir. 2013)………………………………………… 22

*Spool v. World Child Int'l Adoption Agency*,
520 F.3d 178, 183 (2d Cir. 2008)………………………………………… 22

*Styles v. Goord*,
367 F. Supp.2d 473 (W.D.N.Y. 2005)…………………………………… 50

*Tarazi v. Exxon Corp.*,
269 A.D.2d 385, 386, 703 N.Y.S.2d 205, 206 (2d Dep't) (2000)…………… 50

*Tresemer v Barke*,
86 Cal App 3d 656)……………………………………………………… 65

*Triangle Underwriters, Inc. v. Honeywell, Inc.,*
604 F.2d 737 (2d Cir. 1979)……………………………………………..67

*United States v. Batchelor-Robjohns*,
2005 U.S. Dist. LEXIS 13552 (S.D. Fla. 2005)…………………………... 35

## TABLE OF AUTHORITIES (conti…)

**Cases:** Page(s):

*United States v. Dickerson*,
166 F.3d 667 (4th Cir. 1999)………………………………………… 1

*United States v. Garth*,
188 F.3d 99 (3rd Cir. 1999)………………………………………… 1

*Venture Funding, Ltd. v. U.S.*,
190 F.R.D. 209 (E.D. Mich. 1999)……………………………………….. 26

*Watson v. United States*,
865 F.3d 123 (2d Cir. 2017)…………………………………………… 62

*Wetherill v Eli Lilly & Co.*,
89 N.Y.2d 506, 678 N.E.2d 474, 655 N.Y.S.2d 862 (1997)…………………..51

*Whitney v. Quaker Chemical Corp.*,
90 N.Y.2d 845, 847, 683 N.E.2d 768, 660 N.Y.S.2d 862 (1997)……………..51

*Yurman Design Inc. v. Chaindom Enterprises.*,
2000 U.S. Dist. LEXIS 18329 (S.D.N.Y. 2000)……………………………… 25

*Zielinski v. Alfa-Laval, Inc.,*
1989 WL 29482 (W.D.N.Y. March 27, 1989)……………………………… 66

## STATUTES

28 U.S.C. § 1331……………………………………………………. 5
28 U.S.C. § 1332(a)…………………………………………………… 5
28 U.S.C. § 1367……………………………………………………… 5
28 U.S.C. § 1291……………………………………………………… 5
Fed. R. Civ. P. Rule 72……………………………………………18,26
Fed. R. App. P. 32(a)(5)…………………………………………….. 69
Fed. R. App. P. 32(a)(6)…………………………………………….. 69
Fed. R. App. P. 32(a)(7)(B)………………………………………… 69
Fed. R. App. P. 32(a)(7)(B)(iii)…………………………………….. 69

## **OTHER AUTHORITIES**

*Fraud, Misrepresentation, or Deception as Estopping Reliance on Statute of Limitations*,
Ann., 43 ALR3d 429…………………………………………........... 54

*9 Charles Alan Wright Arthur R. Miller*,
Federal Practice and Procedure § 2302.1, at 24 (1995)……………. 53

N.Y. CPLR 214-c(2)…………………………………………. passim

N.Y. U.C.C. § 2-725(1)(McKinney's 1962)………………………… 66

29 CFR 1635.3(g)……………………………………………….. 46

U.S.Const. amend.VII…………………………………………… 53

# **INTRODUCTION**[1]

This appeal involves a 42-year-old mother with pre-existing medical conditions including chronic headaches, Ehlers-Danlos Syndrome(EDS), joint dislocations, and Autoimmune Syndrome Induced by Adjuvants(ASIA).

August 2012, Dr. Buly(hereinafter "Buly") performed hip-replacement surgery using Appellee's devices. Despite surgery, Rouviere experienced ongoing severe pain.[2] She underwent unsuccessful cervical fusion surgery in 2013, resulting in cerebrospinal brain fluid("CSF") leaks and persistent neurological symptoms.

In 2016, Rouviere underwent open exploratory surgery for severe hip pain, dislocation, and health issues. Dr. Alvarado(hereinafter "Alvarado") discovered impingement between Stryker's metal acetabular components and DePuy's metal femoral stem generated excessive metal wear debris. Grayish-brown hip tissue was

---

[1]Pro-se appellant Jodi Rouviere seeks Court's discretion to consider all relevant legal theories in this appeal. *United States v. Dickerson*, 166 F.3d 667,669(4th Cir.1999). Further, Appellant requests this Court liberally construe instant Brief more liberally than a skilled attorney to do substantial justice. *Harris v. Ostrout*, 65 F.3d 912,915(11th Cir.1995);*United States v. Garth*, 188 F.3d 99,102(3rd Cir.1999).

[2]She experienced vertigo, cervical spine dislocation, nausea, vomiting, arm weakness, pain, and persistent symptoms. She had "CSF" leaking from nose/eyes/ears, causing severe headaches, difficulty supporting neck/head, and complete debilitation.*AA-Vol XI p,2534.*

diagnosed as "metallosis"[3] Dr.'s Alvarado, Buly, Gannon(hereinafter Gannon), and Stryker confirmed metallosis could be asymptomatic until observed during open surgery.[4] Rouviere had three-additional surgeries in 2017, leading to complete component removal. Without hip joint, she's permanently handicapped and unable to walk. *Appellant Appendix* ("*AA*")-*Vol-IIIp551:15–552:9,p520:16-p521:7,p498:12-p501:20;p535;2-4;p550:21-25;p562:21-24;AA-VI-p1303-1313*.

In May 2018, Rouviere filed civil complaint against Appellees in court below, asserting product-liability claims against DePuy and Stryker under theories of failure to warn, negligence, strict liability, and breach of express and implied warranties.*AA-Vol-I,p50*. Rouviere amended complaint.*AA-Vol-I,p.118*.

Stryker moved to dismiss complaint on statute of limitation (hereinafter "SOL") grounds. Appellant argued causes of action didn't accrue as metallosis symptoms weren't apparent before 2016. Appellant argued cause of action was timely due to Stryker's deceptive practices; Stryker concealed metal-on-metal risks, leaving Rouviere and her surgeons uninformed regarding its safety/efficacy, and unable to take necessary follow-up measures.

---

[3]Metallosis is condition involving deposition/build-up of metal debris in soft tissues occurring when metallic components/medical implants, specifically joint replacements, abrade against one another.*https://en.wikipedia.org/wiki/Metallosis*

[4]*AA-Vol II p.328:11-329:9;p397:16-p399:4; Supp A Vol I p209:22-p210:13,p210:21-24; Supp A Vol II,p319:18-320:4,AA-Vol-VIII,1768-1769.*

District court held "[i]n years leading up to May 2015, Rouviere began experiencing exactly those symptoms she now seeks damages for and attributes to implantation of [Stryker]'s devices."*SA-Vol-I,p.79.* District court concluded SOL barred Appellant's claims against Stryker, granted motion for summary judgment.*SA-Vol-I,p,91.*

Trial court's reliance on Rouviere's expert's opinions to determine SOL trigger is unsupported since none opined on metallosis from 2012-2015. Gannon, pathologist, opined on hip tissue condition, including metallosis, upon 2016 discovery. Bobst, toxicologist, opined on systemic toxicity, and Tervaert(2019), on immunology(ASIA); both secondary injuries also caused by wear debris.*AA-Vol IV,p.897,AA-Vol-VIII,p.1760-1786(Gannon),AA-Vol-VI,p.1348,AA-Vol-IX,p.1927-2085(Bobst),AA-Vol-X,p.2463-2475,AA-Vol-VII,p1389-1582(Tervaert).*

Impingement and related metal wear debris/ions were consequences of defective MDM/Trident design, not symptoms of Rouviere's metallosis. Cause of injury isn't trigger for SOL(CPLR 214C(2)).*AA-Vol-VIII,p1662,AA-Vol-III,p.490:5-491:5.* Metallosis is **caused** by excessive metal wear debris, not a **symptom** of it. Specific timing of when metal debris exposure led to Rouviere's metallosis' manifestation is unknown and unsupported by evidence.*AA-Vol-IX,p.1974:3-10;AA-Vol-VII,p.1434:8-14,p.1468:8-12,p.1468:25-1469:8,p.1469:16-22,p.1470:23;p.1471:1,p.1487:21-1488:03,p.1491:16-18;AA-*

*Vol-VIII,p.1768 :5-p.1770:11,AA-VI,p1349-1350.*

DePuy argued Appellant didn't prove product defects, despite Magistrate

Judge excluding certain expert opinions raising material factual disputes.[5] District

court granted DePuy summary judgment on grounds Appellant failed to offer

expert opinions regarding defect of DePuy components, abusing its discretion and

failing to protect integrity of judicial process and fundamental fairness to parties by

erroneously striking material portions of report and opinion of Appellant's expert.

Court below also found although DePuy failed to provide adequate warnings, such

failure wouldn't have altered Buly's use of DePuy's devices.

District court, after agreeing with Magistrate Judge's order excluding

Appellant's expert and limiting replacement expert's opinion, granted DePuy's

---

[5]Stryker moved to disqualify Rouviere's expert due to previous involvement with Stryker in another litigation. Magistrate Judge granted Stryker's motion, allowing Rouviere find new engineering expert to provide opinions on same subject areas as [Disqualified Expert]."*SA-p6* However, it was discovered [Disqualified Expert] was also involved in separate, ongoing DePuy litigation and had DePuy conflicts. DePuy's counsel was aware of, but failed to disclose conflict to court or Appellant. Appellant moved to disqualify [Disqualified Expert] as to DePuy also, due to identical conflict as Stryker had. Magistrate Judge denied.*SA-19.* As such, that expert, who never issued opinions regarding DePuy, was inherently conflicted yet Court limited plaintiff's second expert, Dr. Jarrell, to same opinions rendered by [Disqualified Expert]. DePuy filed motion for summary judgment, arguing lack of expert testimony addressing their products. Dr. Jarrell's report addressed this deficiency providing extensive opinions on DePuy's products.*AA-Vol-VIII,p1658-1660.* DePuy subsequently requested Court strike portions of report pertaining to DePuy. Motion was granted.*SA-13.*

motion for summary judgment.*SA-59.* Appellant respectfully submits district court abused its discretion and otherwise erred as matter of law in granting summary judgment in favor of Appellees for reasons stated below. Magistrate Judge's order striking portions of opinion/report of Appellant's expert implicating DePuy and its wrongdoing constituted abuse of discretion or was clearly erroneous and fundamentally unfair.

## **JURISDICTIONAL STATEMENT**

District court had federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1332(a). District court had supplemental jurisdiction over common law and state claims pursuant to 28 U.S.C. § 1367.

This appeal is from final judgment that disposes of all Appellant's claims. December 5, 2022, district court granted Appellee Howmedica's motion for summary judgment and entered final judgment.*SA-92.* Appellant filed notice of appeal December 22, 2022 final order granting summary judgment to Howmedica.*AA-Vol-XI,p.2760.* December 30, 2022, Appellant filed amended notice of appeal.*AA-Vol-XI,p.2796.*

On January 4, 2023, district court entered final judgment granting summary judgment for Appellee DePuy.*SA-p.93.* Appellant filed notice of appeal January 10, 2023 from final order granting summary judgment to DePuy.*AA-2798.* This Court has jurisdiction under 28 U.S.C. § 1291.

**STATEMENT OF ISSUES**

**I.     Whether district court erred in granting DePuy's motion for summary judgment.**

1. Whether Rouviere's objection to Magistrate Judge's Order striking parts of Dr. Jarrell(hereinafter "Jarrell") report was timely.

2. Whether Magistrate Judge's orders striking portion of report and opinion of Rouviere's expert were clearly erroneous, abuse of discretion, or contrary to law.

3. Whether deficient warnings by DePuy proximately caused Rouviere's injuries; granting summary judgment in favor of DePuy was contrary to clearly established law.

4. Whether different or adequate warnings would've led Rouviere's surgeon Dr. Buly to not use and not recommend Rouviere use Appellees' components.

**II.     Whether the district court erred in granting Stryker's motion for summary judgment**

1. Whether Appellant's claims are time-barred by New York's 3-year personal injury SOL.

2. Whether district court erred Appellees shouldn't be equitably estopped from claiming action was untimely due to Appellees egregious and extreme fraudulent misrepresentations about nature of product.

3. Whether district court erred in finding Appellant's claims for implied and express warranties were time-barred.

**STATEMENT OF CASE**

**I.     FACTUAL BACKGROUND**

**DePuy Orthopaedics, Inc.("DePuy").** In 2012, DePuy's femoral Summit

stem(titanium) and Biolox(ceramic) head, along with Stryker's acetabular devices,

were implanted into Appellant. Despite knowing failures from metal-on-metal

6

impingement with Stryker's Trident shell/metal liner, DePuy still did nothing to prevent its pairing with their stem. *AA-Vol-IV,p.891;AA-Vol-VIII,p.1836:8-18.*

Unbeknownst to Appellant, metal components impinged, resulting in excessive release of toxic metal debris and ions into her. Based on alleged injuries she sustained as result, Rouviere brought claims for negligence, strict product liability, failure to warn, breach of express warranty, and breach of implied warranty against[Appellees].*AA-Vol-I,p.118-188.*

**Howmedica Osteonics, Corp.(also "Stryker").** Stryker's acetabular MDM liner/ADM insert/Trident shell, along with DePuy's femoral devices, were surgically implanted in Appellant. Unknowingly, three metal components impinged, releasing excessive toxic metal debris and ions into her. Rouviere filed claims against defendant alleging negligence, strict products liability, failure to warn, breach of express warranty, and breach of implied warranty, based on injuries she allegedly suffered.*AA-Vol-I,p.118-188.*

In 2011, Stryker introduced the ADM dual-mobility implant with ADM polyethylene insert.*ECF345-1 ("Exhibit Dr. Ochoa Exhibit 13 Report-Stryker Material" at bates # STRROUV00005459)(Sealed-Document).*[6] Cobalt- chromium MDM liner was sold separately, used with ADM insert, indicated for patients like Rouviere. *Supp-A-Vol-I,p.120:17-121:6;p.124:3-7,p.126:12-17,p.127:7-*

---

[6] ECF is abbreviation of docket entry in case below.

*17,p.171:20-25,p.223:13-19.* Stryker considered addressing impingement as "business opportunity" and falsely advertised to Rouviere's physicians MDM/Trident was safe/effective alternative to metal-on- metal, minimized impingement and wear debris, reduced dislocations, and helped eliminate pain. Claims that were actually risks MDM imposed with its inherent metal-on-metal impingement design.*AA-Vol-XI,p2595¶58-2599¶80;ECF 345-17(Sealed-Documents at bates no's. STRROUV00001710-1715,STRROUV00001801, STRROUV00005459,STRROUV00005463,STRROUV00005465;Supplemental Appendix ("SA")-A-Vol-I,p.135:17-24.*

Stryker concealed knowledge of defective metal-on-metal impingement failing to disclose to Rouviere and her surgeons its design introduced more severe risks than metal-on-metal bearings. Stryker referred to device as a "new impingement system" acknowledging: "In dual-mobility systems, neck impingement is part of system's function and related wear is a clinically relevant preoccupation" *ECF345-16 (SEALED-DOCUMENTS bates no's STRROUV00000817-18), ECF345-17 bates no's STRROUV00005645¶2, STRROUV00006582-6584.*

**<u>Jodi Rouviere (Rouviere)</u>**. Appellant Rouviere sustained hip injury in 2009 resulting in extreme pain; "she wore brace on right leg, could barely walk, often used a wheelchair, and couldn't climb up stairs."*AA-Vol-XI,p.2587¶2.* "Rouviere

underwent multiple bilateral arthroscopic hip procedures *id.* "Rouviere was

diagnosed with Ehlers-Danlos syndrome, connective tissue disorder."*AA-Vol-XI,p.2587¶3.* April 2012 medical records noted extreme global hypermobility and

dislocations including bilateral hips, knees, wrists, shoulder, neck and back.

Rouviere underwent unsuccessful four-level anterior cervical discectomy/fusion

February 21, 2013.[7]

August 14, 2012, Appellant had total-right-hip-replacement-surgery. Buly

implanted Defendants' devices made and sold by Defendants. *AA Vol V,p976-987.*

Unbeknownst to Appellant, Buly, and Alvarado, her implants caused metal

impingement, releasing excessive metal debris resulting in metallosis, often

asymptomatic and only detectable in open surgery, with secondary metal ion

deposition in Rouviere's bloodstream. *AA-Vol-III,p511:11-512:9;AA-Vol-II,p*

*397:16-398:4;AA-Vol-VIII,p.1768,116:5-118:11.*

February 2013, Rouviere had cervical dislocation and unsuccessful

emergency cervical fusion surgery leading to unstable spine, severe neurological

---

[7]Stryker's unsupported, false narrative omitted records ***before implantation***
Rouviere reported pain/instability throughout her body/hips due to EDS to
Sandhouse.*AA-Vol-X,p.2477-2493,AA-Vol-XI,p2714,#3.*

symptoms, debilitating "CSF" leaks, and significant decline in health. Rouviere sought consultation with neurosurgeons and neurologists 2013-2014.[8]

April 2013, Buly confirmed Rouviere had no implant failure/injuries and discharged her.*AA-Vol-II,p.353:15-355:10,p.397:5-7,p.398:10-399:4.* Stryker recommends regular, long-term follow-up. *ECF346-16,p.STRROUV00000007 (SEALED-DOCUMENT).* Diligently, Rouviere consulted with Dr. Burke in 2014, who found no implant failure/injuries.*AA-Vol-V,p.1068.*

In June 2014, Dr. Hendersen diagnosed Rouviere with cervical medullary syndrome and recommended two fusion/stabilization surgeries. Rouviere declined, resulting in ongoing severe chronic neurological/cognitive symptoms including headaches, nausea, dizziness, vertigo, tremors, and neck pain from 2014-2015. Seeking alternatives, Rouviere underwent successful stem cell infusions in 2016.*AA-Vol-V,p.1022-1051,p.1106;AA-Vol-XI,p.2607-2615;AA-Vol-IX,p.2212:20-2216:17,AA-Vol-X,p.2389:18-2390:22.*

In May 2015, Alvarado examined Appellant in hospital for hip concerns, systemic issues, and concern for metallosis. Diagnostic tests revealed no implant failure or metallosis. Alvarado assured Rouviere her implant wasn't associated with such risks or subject to recall. Rouviere didn't seek further information about

---

[8]These symptoms were incorrectly used to trigger Rouviere's SOL and not related to discovery of metallosis.

metallosis thereafter.*AA-Vol-III,p.482:13-16;AA-Vol-VI,p.1353¶17.*

In August 2016, Rouviere suffered prosthesis dislocation and underwent closed surgery. Then, November 11, 2016, she had open exploratory surgery. Alvarado informed Rouviere he found titanium DePuy stem impinged with cobalt-chromium Stryker MDM liner and Trident shell causing excessive metal debris and grayish- brown hip tissue confirming metallosis.*AA-Vol-III,p.551:15–552:9,p.520:16-521:7,p.498:12-501:19.*

Rouviere's diagnostic testing was negative regardless of having metallosis. *AA-Vol-III,p.486:2-489:11,p.527:11-25,p.556:17-563:15;AA-Vol-V,p.1068-1086.*

Rouviere underwent two additional revisions, in February and May 2017 removing/replacing components, finally removing Stryker's Trident shell in May 2017. In October 2017, girdlestone surgery was performed, all components were removed.*AA-Vol-VI,p.1265,1376-1377;AA-Vol-III,p.549:9-10,p.556:17-563:15.*

**Appellant's Claims of Injury**

In Appellant's amended complaint, she made following factual claims of injuries:

- Metal debris and ion-induced metallosis and toxicity and related injuries (necrotic tissue, pseudotumors, etc.) causing pain, swelling, inflammation, adverse tissue reactions, and decrease in range of motion caused by excessive metal debris (including cobalt-chromium)*AA-Vol-I,¶¶126–28;AA-Vol-III,p.587;* Appellant's primary condition was metallosis resulting from excessive wear debris (and related consequences) first discovered upon Rouviere's revision November 2016.[9]

---

[9]Stryker agreed cause of Rouviere's claimed injury was "tissue reaction / metallosis".*AA-Vol-X,p.2521.* Court agreed primary condition was metallosis.*SA-7.*

- Upon implementation, Rouviere alleges she suffered injury, physiological instability, toxicity, and toxic result from interaction of devices.*AA-Vol-I.(Id.) ¶6;AA-Vol-VI,p.1354¶6.*

- High levels of metal wear and ions, elevated blood levels of chromium- cobalt. Titanium and chromium-cobalt toxicity.*AA-Vol-I,p.135¶105,136¶¶113,114, p.139¶¶126,127,p.140¶¶128,129,135,p.142¶¶151,152,p.144¶169,p.145¶¶170 ,173.*

**Discovery Proceedings in Case Below.** Appellant obtained engineer expert

(hereinafter "Disqualified Expert"), who represented he was conflict-free to opine

regarding both Appellees' products implanted into and removed from Rouviere.

[Disqualified Expert's] opinion and report[10] stated in pertinent parts:

> "[Disqualified Expert's Employer] was retained…***to evaluate explanted hip prosthesis systems manufactured by DePuy Orthopedics and Stryker Orthopedics to determine if components were defective in either their manufacture, design and/or failure to adequately warn.*** [Disqualified Expert] was also given three kidney stones removed from plaintiff for analysis to determine metallic chemistry content. [Disqualified Expert's Employer] was tasked with performing non-destructive evaluation of explanted hip system and kidney stones retrieved from Jodi Rouviere. This report addresses materials and manufacturing aspects of [Disqualified Expert's Employer]'s investigation conducted by [Disqualified Expert]. Specifically, [Disqualified Expert's Employer] was asked to review available physical evidence of explanted medical devices, kidney stones, manufacturing records, DePuy and Stryker documents, exemplar components, scientific literature, and medical records of Rouviere pertaining to these issues."

---

[10]Expert reviewed depositions of DePuy's corporate representative, its marketing materials, medical appliances/devices.

…Stryker's competitor, DePuy, was aware of Stryker's impingement issue in 2009 when it was presented at National DePuy Sales Meeting and stated: "All data points to metal contamination from neck [DePuy's product] impingement with Trident cup."

Explanted stem [DePuy's product] and liner showed direct evidence of significant wear resulting in severe metallosis. Amount of metal loss from stem's neck [DePuy's product] was extremely significant compared to metal-on-metal articulating joints shown to cause adverse metal debris reactions.

Stryker MDM Liner System presented unreasonable risk of harm. Its risks outweighed perceived benefits. These risks in excessive metal wear debris and metal ions, caused Rouviere's early failure and undesirable clinical outcome.

*AA-Vol-VII,p.1592-1594.*

October 14, 2020, two days before [Disqualified Expert]'s deposition by DePuy, Stryker filed motion to disqualify and strike his report/opinion on grounds he had ongoing relationship with Howmedica as undisclosed retained expert witness in other pending litigation and was conflicted.*AA-Vol-I,p.191,p.233.*[11]

Magistrate Judge granted Howmedica's Motion to Disqualify Appellant's engineer expert October 25, 2020, and ordered Appellant serve "expert disclosure

---

[11]DePuy didn't file separate motion to disqualify Plaintiffs' engineer expert, DePuy stood silently but it was revealed DePuy also had ongoing relationship with expert, who was their witness in MDL litigation. Plaintiff presented evidence, including sworn affidavit from MDL Plaintiffs' counsel, indicating DePuy's litigation was still open and pending, making expert conflicted for DePuy too. DePuy's confidential relationship with [Disqualified Expert,] like Stryker's, hadn't been terminated but, instead, as Howmedica argued in its Motion to Disqualify.

by alternate engineer expert regarding same scope of subject areas as were covered by Engineer Expert."*SA-1.*[12]

October 21, 2020, while Howmedica's Motion to Disqualify was pending, DePuy filed motion for summary judgment claiming lack of evidence against DePuy, claiming in large part [Disqualified Expert] didn't implicate DePuy or its products in causing Rouviere's injuries.*AA-Vol-I,p.191,194,196,212,216.*

In its motion, DePuy acknowledged [Disqualified Expert] reviewed and considered "DePuy-related documents"*(AA-Vol-I,p.212.),* altogether ignoring opinions regarding their products and continued silence regarding its relationship with [Disqualified Expert].

Again, pressed to find engineer to render expert opinion in short time frame, Appellant identified and retained Jarrell to analyze and opine regarding same scope of subject areas previously covered by [Disqualified Expert].

In his report, Jarrell identified scope of his retention as follows:

> "to evaluate explanted hip prosthesis systems manufactured by DePuy and Stryker and review documentation and data to determine if components were defective in either their manufacture, design and/or failure to adequately warn."

---

[12]The phrase "regarding same scope of subject areas as were covered by Engineer Expert" wasn't further clarified or explained in the order.

*AA-Vol-VIII,p.1658-1660*. This is same scope of retention previously described. *See:AA-Vol-VII,p.1584-1594.*

November 9, 2020, Appellant disclosed Jarrell and his report, stating he reviewed same materials, including highlighted sales marketing materials from DePuy previously reviewed by [Disqualified Expert]. Jarrell's opinions highlight multiple defects and negligence by DePuy and HOC:

- Stryker knew this component impingement was an issue, as did one of their competitors (DePuy), and failed to warn surgeons metal- to-metal contact at neck and liner impingement point could be source of metal ion contamination in patients.

- DePuy failed to warn specifically against pairing DePuy Summit Duofix and Biolox head with Stryker's Trident Acetabular cup. DePuy's sales training documentation from 2009 shows knowledge of defective design issues Stryker Trident cup from raised metal rim of liner which causes metal contamination from femoral neck impingement with Trident Cup. DePuy educated their sales team on other manufacturer's dangerous and toxic failed components but didn't warn against pairing their components with Stryker's failing products.

- DePuy failed to warn this neck impingement would result in release of toxic metal particles and cytotoxic cobalt-chromium metal ions, when their internal documents demonstrate they understood risks of metal contamination from wear related to elevated metal debris and metal ions from cobalt-chromium wear.

- DePuy IFU lacks sufficient Warnings. IFUs that accompanied DePuy's Summit Stem and Biolox Delta ceramic head didn't warn about expected metal-to-metal impingement and related potential for metal wear debris postoperatively. DePuy's Instructions for Use ("IFU") for Summit Stem and Biolox Delta Head gave interoperative warning about impingement and instructs surgeon range of motion should be thoroughly checked for improper mating, instability, or impingement and corrected as appropriate. However, they failed to warn or make other mention of expected metal-to-

metal impingement and related wear debris in IFU.

- DePuy advertised Summit Stem's neck geometry decreased risk of dislocation due to secondary prosthetic impingement in Summit Tapered Hip System Surgical Technique. Additionally, DePuy advertised Summit Stem's design and polished neck decreased risk of wear debris generation, secondary to prosthetic impingement in 2011 Summit Tapered Hip System Surgical Technique.

- DePuy has given warnings in past when two products shouldn't be paired together from lack of compatibility but failed to give such warnings against pairing DePuy Summit Duofix and Biolox head with Stryker Trident Acetabular cup.

- DePuy's Instructions for Use (IFUs) didn't contain adequate warnings of all known risks related to Rouviere's implants and injuries.

- Rouviere had hyperlaxity as pre-existing condition. A review of DePuy's IFUs and Surgical Techniques for primary hip components showed laxity and hyperlaxity not contra-indicated for these components.

*AA-Vol-VIII,p.1655-1690.*

Several of Jarrell's opinions were nearly identical to [Disqualified Expert's] opinions, except Jarrell was more direct regarding DePuy and identifies DePuy by name. Although Jarrell expressed additional opinions, they were well within scope of what he was charged with doing and, in fact, did.

DePuy filed motion to strike, claiming Jarrell's DePuy-related opinions outside scope of subject areas covered by [Disqualified Expert].*AA-Vol-I,p.250.* DePuy argued Jarrell's opinion "stands in stark contrast" to [Disqualified Expert's] opinion because Jarrell gives opinions regarding DePuy and its components.*Id.* DePuy argued Jarrell's opinions were new and disclosed after September 21, 2020

for disclosure of expert opinions.[13]

In response to DePuy's motion, Appellant pointed out scope of subject areas considered by alternate expert was same as considered by [Disqualified Expert].*AA-Vol-VII,p.1584.* Appellant informed court below she recently learned [Disqualified Expert] who rendered original, more conservative opinion, also had undisclosed ongoing relationship with DePuy.*Id.*

Magistrate Judge conducted telephonic hearing on DePuy's motion to strike. Appellant proffered she'd been misled [Disqualified Expert] was "conflict-free" based on his and his employer's representations.*See:AA-Vol-VIII,p.1722-1724.* Neither disclosed his ongoing relationship with DePuy (or Howmedica) and problematically, DePuy instead, stood idly by as Howmedica disclosed its ongoing relationship. *ECF218 (SEALED-DOCUMENT).*

November 24, 2020, Magistrate Judge entered order granting DePuy's motion to strike and held: Prior to September 21, 2020 deadline for parties' expert disclosures, Plaintiffs failed to serve expert disclosure regarding design defect and failure to warn issues as to DePuy. Expert report of Prior Engineer Expert gave such opinions as to Howmedica, but not DePuy. (See:Catullo Decl. Ex. A at 12.)

---

[13]As explained above, that is, of course, inaccurate. [Disqualified Expert] did analyze and consider DePuy's components and warnings, which were expressly within scope of [Disqualified Expert's] retention, and he did render opinions regarding DePuy, albeit conservatively.

November 9, 2020, Plaintiffs, for first time, offered failure to warn opinions as to DePuy, in Jarrell expert report.(See:DePuy Ltr. Mot. Ex. A at 8-10.) Because Court finds Plaintiffs have failed to make showing of good cause for their failure to offer DePuy-related opinions by September 21, 2020 deadline, Court grants DePuy's motion to strike.*SA-13.*

Magistrate Judge didn't consider or make a finding regarding whether Jarrell's opinions were actually outside of the scope of what was considered by [Disqualified Expert].  December 19, 2020, Magistrate Judge denied Appellant's Motion to for reconsideration.*SA-14.*

**<u>As to DePuy</u>:**

Appellant claimed defective design and failure to warn of latent dangers with DePuy's devices. Expert opinions of [Disqualified Expert] and Jarrell were presented to support claims. After striking Jarrell's opinion, court below held "lack of expert testimony specific to DePuy dooms Rouvieres' defective-design claims." Court made following findings of fact and conclusions of law:(1)Filing of motion for reconsideration does affect Rule 72's 14-day deadline to file objection before district judge;(2)Jarrell report expressed opinions well beyond those expressed in [Disqualified Expert's] report, and court's denial of Rouvieres' request to reopen expert discovery was not erroneous or contrary to law. "Though this result is harsh, it isn't unfair." (3)"there is genuine dispute about adequacy of DePuy's warnings

but DePuy is nevertheless entitled to summary judgment because Rouvieres have adduced no evidence DePuy's insufficient warnings proximately caused Rouviere's injury." (4)Although genuine dispute over whether DePuy's warnings were deficient, Rouviere failed to provide evidence in support of her two theories of proximate causation of her injuries, i.e.,Buly wouldn't have used the DePuy components had he been adequately warned about risk of impingement. And, more robust warnings by DePuy would've led Buly to give Rouviere more detailed warnings, in which case she wouldn't have consented to surgery."[14]*SA-56.*

**As to Stryker**:

Court below held "Rouviere was aware prior to May 2015 of injuries she now claims were caused by Defendant's allegedly tortious acts."*SA,p.84.* Court noted: "It is true that there's evidence Rouviere didn't begin to suspect her symptoms were related to the implant malfunction until May 2015 and her doctors

---

[14]This finding is contrary to trial record below and constitutes clear error by court below. Buly didn't say he would've continued to use this device if he knew metal-on-metal impingement was occurring, he said opposite. Dr. Buly was clear in his testimony he wasn't okay with metal-on- metal impingement, and it was something to be avoided. He wasn't aware Trident/MDM/Stem were designed to impinge and said he'd be surprised if they'd made it to impinge; he couldn't imagine any designer would want to have *more* impingement in total hip system. But Buly wasn't warned by DePuy, and therefore wasn't aware of metal-on-metal impingement Trident/MDM/ Stem imposed.*AA-Vol-VIII,p.1854:9-1855:11,p.1856:1-10.*

didn't determine devices at issue were cause of those symptoms until November 2016 (when she underwent her partial revision surgery). Those facts make it understandable she didn't file suit prior to November 2016 (though it's more difficult to understand why she waited until May 2018)."*SA,p.83.* Court further held Rouviere should've identified her main condition of metallosis during 2012-2015, when she experienced symptoms, putting her outside of SOL.*SA,p.84.*

Court below determined SOL barred Rouviere's claims for following reasons:

1. Under New York law, "SOL begins to run in latent exposure case when injured party discovers primary condition on which claim is based." "Symptoms must put plaintiff on notice of primary condition on which claim is based."

2. "In the years leading up to May 2015, Rouviere began to experience exactly those symptoms she now seeks damages for and attributes to implantation of Defendant's device." "These symptoms map into the injuries Plaintiff's experts state Rouviere experienced from Defendant's conduct."

3. "Throughout this litigation, . . . Plaintiffs have proffered a theory of case that symptoms Rouviere suffered shortly after 2012 surgery were attributable to implementation of devices."

4. Plaintiff's "expert opinions opining these 2013-2014 symptoms were caused

not by Rouviere's underlying medical conditions but by excessive metal debris from impacted hip components."

5. Plaintiff's claims for implied and express warranty are barred by SOL.

6. Plaintiff's allegations of fraud on behalf of Stryker involve misrepresentations made to community at large and thus are insufficient to justify equitably estopping Defendant from asserting SOL defense.

*SA,p.84-87.*

## II.    <u>PROCEEDINGS HISTORY</u>

Appellant and her husband filed amended complaint against Appellees. Complaint sought damages for severe and permanent personal injuries including metal debris and ion-induced metallosis and toxicity and related injuries (necrotic tissue, pseudotumors, etc.) causing pain, swelling, inflammation, adverse tissue reactions, and decrease in range of motion, high levels of metal wear/ions, elevated blood levels of chromium-cobalt, and titanium, chromium-cobalt toxicity, surgical revision/removal of implants, pain and suffering, economic loss and permanent disability, Rouviere allegedly sustained as consequence of being impacted by devices manufactured/sold by Defendants.*AA-Vol-I,p.139-140¶¶126–28.*

September 17, 2021, court below granted summary judgment in favor of DePuy on all counts because:(1)Appellant's expert's opinion, after being stricken in parts, failed to adduce evidence as to proximate causation in support of her

failure to warn claim against DePuy; and(2)Rouvieres proffer no evidence additional DePuy warnings would've led Buly to choose different components or give additional warnings to Rouviere. Thus, while Rouvieres have adduced evidence as to inadequacy of DePuy's warnings, they haven't met their burden to adduce evidence of proximate causation."*Id.*

Court below granted summary judgment in favor of Stryker. December 6, 2022, final judgment in favor of Stryker filed by court below.

December 22, 2022, Appellant filed notice of appeal from final orders entered by court below. December 30, 2022, Appellant filed amended notice of appeal. January 4, 2023, final judgment in favor of DePuy Appellant filed by court below. January 10, 2023, Appellant filed Second Notice of Appeal from January 4, 2023 final judgment.

### III.    <u>STANDARD OF REVIEW</u>

This Court reviews order granting motion for summary judgment de novo, meaning without deference to district court. *Sotomayor v. City of New York*, 713 F.3d 163,164(2d Cir.2013). "Summary judgment is proper only when, construing evidence in light most favorable to non-movant, 'there is no genuine dispute as to any material fact and movant is entitled to judgment as matter of law."*Doninger v. Niehoff*,642 F.3d 334,344(2d Cir. 2011)(*quoting Fed.R.Civ.P.56(a)*).

Whether claim states cause of action is also reviewed de novo by this Court.

*See, Spool v. World Child Int'l Adoption Agency*,520 F.3d 178,183(2d Cir.2008).

This Court reviews district court's application of SOL de novo. *Somoza v. N.Y.C.Dep't of Educ.*,538 F.3d 106,112(2d Cir.2008).

This Court "review[s] district judge's exclusion of evidence from expert witness for abuse of discretion." *Sarkees v. E.I.Dupont De Nemours &Co.*,15 F.4th 584,588(2d Cir. 2021).

## **ARGUMENT**

Rouviere's claims were plead in that metallosis had to occur first before symptoms of pain, swelling, inflammation, adverse tissue reactions, decrease in range of motion, and metal-ion induced toxicity could follow, and her injuries thus allegedly resulted from latent exposure to toxic substance, not merely mechanical problem. These allegations and evidence in support of same are precisely type which New York legislature was concerned with when passing C.P.L.R. 214-c(2). *SA,p.72*. Court held Rouviere's symptoms should've led her to discovery of metallosis from 2012-2015. Facts presented in record don't support this finding of fact.

Further, Stryker should've been estopped from asserting SOL defense given fraud they engaged in depriving Appellant of necessary warnings of defective devices manufactured/sold by Defendants and used by Rouviere.

Appellant did present Jarrell's expert testimony on key factual issues for

jury: defective device design, failure to warn, and impact on Appellant's consent to

surgery. However, court below excluded the opinion and testimony, granting

Appellees unfair advantage and judicial win.

## POINT I

## DISTRICT COURT ERRED IN GRANTING DEPUY'S MOTION FOR SUMMARY JUDGMENT

Appellant submits district court erred in granting DePuy's motion for

summary judgment.  District court knew exclusion of report of Appellant's expert

opining on defects of DePuy's medical devices and lack of warnings by DePuy of

known defects of said medical devices "doomed" her claims. It was abuse of

discretion for district court to deny Appellant her right to present expert testimony

to prove her claims against DePuy and granting summary judgment to DePuy.

**1.  Rouviere's objection to Magistrate Judge's Order Striking Parts of Jarrell Report Was Timely**

September 2020, Appellant filed motion seeking additional time to file

expert witness disclosure.*AA-Vol-I,p.189*. Magistrate Judge denied motion. After

informing Appellees of Appellant's new expert witness and opinion rendered,

Stryker filed motion to disqualify Appellant's new expert ["Disqualified Expert"],

citing Stryker retained [Disqualified Expert] in other litigation. Magistrate Judge

granted motion and directed Appellant file alternate expert opinion "regarding

same scope of subject areas covered by [Disqualified Expert*]."SA,p.6.*

Appellant "served report from alternate engineer expert, Jarrell.*AA-Vol-VIII-p.1651*. Jarrell opined DePuy failed to warn of product defects.*(Id.)*. DePuy moved to strike portions implicating DePuy and its devices, citing opinion exceeded scope of [Disqualified Expert]. Magistrate Judge agreed and so ordered. After Appellant's motion for reconsideration was denied, Appellant filed timely appealed Magistrate Judge's orders by filing objection.*AA-Vol-VIII,p.1732*.

District court below refused to follow other decisions by jurists of reason in Southern District of New York. *Graham v. City of New York*, 2010 U.S. Dist. LEXIS 78184(S.D. N.Y. 2010) ("time period for objections to April 5 Order was tolled until May 14, 2010, when Judge Levy denied defendants' motion for reconsideration.");*Norex Petroleum Ltd. v. Access Indus.*,2003 U.S. Dist. LEXIS 13725(S.D.N.Y. 2003)("Because ten-day period within which party may file objections to Magistrate Judge Fox's order was tolled while motion to reconsider that order was pending, this Court isn't barred from considering Appellant's Objection to Magistrate Judge Fox's March 20, 2003 order.")(citing, *Yurman Design Inc. v. Chaindom Enterprises.*,2000 U.S. Dist. LEXIS 18329,No. 99 civ. 9307 (JFK),2000 WL 1871715,at*1(S.D.N.Y. Dec. 20, 2000)("While neither Federal nor Local rules expressly address this issue, courts in Southern District, which are governed by same Local Rules as Eastern District with some limited exceptions, have found 'during pendency of a motion for reconsideration before

Magistrate Judge, time for filing objection to District Court is tolled.' As a practical matter, it would make no sense for a District Judge to decide an [objection] pursuant to Rule 72(a) while order in question was still under consideration by Magistrate Judge, who might change all or some of order on reconsideration."); *Equal Employment Opportunity Commission v. Venator Group Specialty, Inc.*,2001 U.S. Dist. LEXIS 2506,No.99 Civ. 4758(AGS),2001 WL 246376, at*4(S.D.N.Y. March 12,2001)).

Other federal courts would've construed Appellant's motion for reconsideration as an objection to Magistrate Judge's order. *See:Davis v. Armstrong Relocation, LLC*, No. 2:05-cv-632-WKW,2007 U.S. Dist. LEXIS 62399,2007 WL 2460609,*1(M.D. Ala. Aug. 23, 2007)(construing motion for reconsideration as an objection to Magistrate Judge's order);*McCornack v. Actavis Totowa*, LLC, Civil Action No. 2:09-cv-00671,2011 U.S. Dist. LEXIS 76607, 2011 WL 2836318,*1(S.D.W.Va. July 14, 2011)(same);*Partminer Worldwide Inc.v. Siliconexpert Techs. Inc*., Civil Action No. 09-cv-00586-MSK-MJW,2011 U.S. Dist. LEXIS 157997,2011 WL 587971,*5(D.Colo. Feb. 9, 2011)(same);*Smith v.Bell, Civil Action* No. 5:010cv58, 2011 U.S. Dist. LEXIS 9743, 2011 WL 344122,*1(E.D. Tex. Feb. 1, 2011)(same);*Venture Funding, Ltd. v. U.S*., 190 F.R.D. 209, 212-13(E.D. Mich. 1999).

For reasons stated in published opinions of above federal courts, Appellant objections were timely filed and court below erred.

## 2. Magistrate Judge's order striking opinion of Rouviere's expert Dr. Jarrell was clearly erroneous, abuse of discretion or contrary to law

Dr. Jarrell's (hereinafter "Jarrell") expert testimony was core evidence to sustain Appellant's case against DePuy. Court below stated:(1)exclusion of "Dr. Jarrell's DePuy-related opinions" "is harsh."*SA-p43 (*2)lack of expert testimony dooms Rouvieres' defective-design claims; and(3)there is genuine dispute about adequacy of DePuy's warnings but DePuy is nevertheless entitled to summary judgment because Rouvieres have adduced no evidence that DePuy's insufficient warnings proximately caused Rouviere's injury."*SA,p.44*.

After Appellant's initial expert dropped out days before mandatory disclosure, Appellant asked Magistrate Judge for enlargement of time to file expert disclosure.*AA-Vol-I,p.189.* Magistrate Judge denied request.

With great speed, Appellant obtained and disclosed another expert (now known as "Disqualified Expert") who opined:

> …Stryker's competitor, DePuy, was aware of the impingement issue in 2009 where it was presented at National DePuy Sales Meeting and it was stated: "All data points to metal contamination from neck [DePuy's product] impingement with Trident cup."

> …explanted stem [DePuy's product] and liner from Rouviere showed direct evidence of significant wear that resulted in severe metallosis reactions. Amount of metal loss from stem's neck [DePuy's product] was extremely significant when compared to metal-on-metal articulating joints

shown to cause adverse metal debris reactions.

Stryker MDM Liner System presented an unreasonable risk of harm. Its risks outweighed its perceived benefits. These risks in excessive metal wear debris and metal ions, causing early failure and an undesirable clinical outcome for Rouviere.

*AA-Vol-VII,p.1592-1594*.

[Disqualified Expert's] report makes it abundantly clear he was retained to review/analyze both Howmedica and DePuy products implanted in and removed from Appellant, he did review/analyze both systems, and opined regarding both Appellees, their products and performance and contributions to Rouviere's injuries. Although his DePuy opinions may not have been so "strong", he was charged with and did opine regarding DePuy and their products.

Thereafter, Stryker moved to disqualify [Disqualified Expert]. Magistrate Judge granted motion and directed Appellant "serve an expert disclosure by an alternate engineer expert regarding same scope of subject areas as were covered by Engineer Expert."*SA-1*.

Appellant timely identified and retained Dr. John Jarrell to analyze and opine regarding same scope of subject areas previously covered by [Disqualified Expert]. Jarrell concluded:

- Stryker knew this component impingement was an issue, as did one of their competitors (DePuy), and failed to warn surgeons that metal-to-metal contact at neck and liner impingement point could be source of metal ion contamination in patients.

28

- DePuy failed to warn specifically against pairing DePuy Summit Duofix and Biolox head with Stryker Trident Acetabular cup. DePuy's 2009 sales training documentation shows knowledge of defective design issues with Stryker Trident cup from raised metal rim of liner causing metal contamination from femoral neck impingement with Trident Cup. DePuy educated their sales team on other manufacturer's dangerous and toxic failed components but didn't warn against pairing their components with Stryker's failing product.

- DePuy failed to warn this neck impingement would result in release of toxic metal particles and cytotoxic cobalt-chromium metal ions, when their internal documents demonstrate they understood risks of metal contamination from wear related to elevated metal debris and metal ions from cobalt-chromium wear.

- DePuy IFU lacks sufficient Warnings. IFUs that accompanied DePuy's Summit Stem and Biolox Delta ceramic head didn't warn about expected metal-to-metal impingement and related potential for metal wear debris postoperatively. DePuy's Instructions for Use ("IFU") for Summit Stem and Biolox Delta Head gave an interoperative warning about impingement and instructs surgeon range of motion should be thoroughly checked for improper mating, instability, or impingement and corrected as appropriate. However, they failed to warn or make other mention of expected metal-to-metal impingement and related wear debris in DePuy Summit Stem and Biolox Head IFU.

- DePuy advertised Summit Stem's neck geometry decreased risk of dislocation due to secondary prosthetic impingement in Summit Tapered Hip System Surgical Technique. Additionally, DePuy advertised Summit Stem's design and polished neck decreased risk of wear debris generation, secondary to prosthetic impingement in 2011 Summit Tapered Hip System Surgical Technique.

- DePuy has given warnings in the past when two products shouldn't be paired together from lack of compatibility, but failed to give such warnings against pairing DePuy Summit Duofix Hip stem and Biolox head with Stryker's Trident Acetabular cup.

- DePuy's Instructions for Use (IFUs) didn't contain adequate warnings of all

known risks related to Rouviere's implants and injuries.

- Rouviere had hyperlaxity pre-existing condition. Review of DePuy's IFUs and Surgical Techniques for the primary hip components showed laxity and hyperlaxity was not contra- indicated for these components.

*AA-Vol-VII,p.1583.*

Several of Jarrell's opinions were nearly identical to [Disqualified Expert's] opinions, except Jarrell was more direct regarding DePuy and identifies DePuy by name. Although Jarrell expressed additional opinions, they were well within scope of what he was charged with doing and, in fact, did. *Id.*

[Disqualified Expert] did analyze and consider DePuy's components and warnings, which were expressly within scope of [Disqualified Expert's] retention, and [Disqualified Expert] did render opinions regarding DePuy, albeit conservatively.*AA-Vol-VII,p.1583-1594.* However, Magistrate Judge held "Plaintiffs, for first time, offered failure to warn opinions as to DePuy, in Jarrell expert report."*SA,p.11*. Magistrate Judge granted DePuy's motion to strike, which doomed Appellant's failure to warn claims against DePuy and paved way for district court to grant summary judgment to DePuy.

It's beyond peradventure mission statements and scope of subject areas considered and performed by [Disqualified Expert] and Jarrell were same; only distinction is Jarrell's indication was "to review documentation and data" which [Disqualified Expert] didn't expressly state. Mission statements were identical, and

experts were retained regarding exact same scope of subject areas. To extent Magistrate Judge based his decision on finding Jarrell wasn't retained as expert regarding same scope of subject areas, Magistrate Judge's decision is flatly contradicted by record and clearly erroneous or abuse of discretion.

[Disqualified Expert] didn't only state opinions regarding Howmedica, but as explained above, specifically expressed opinions regarding DePuy, including, DePuy "was aware of impingement issue in 2009 where it was presented at National DePuy Sales Meeting and stated: 'All data points to metal contamination from neck [Depuy's product] impingement with Trident cup.'"[Disqualified Expert] also opined Depuy's products explanted from Rouviere "showed direct evidence of significant wear that resulted in severe metallosis reactions," and amount of metal loss from Depuy's product was "extremely significant when compared to metal-on-metal articulating joints shown to cause adverse metal debris reactions."*AA-Vol-VII,p.1592-1594*. Thus, Magistrate Judge's finding, which served as basis for his Order, that [Disqualified Expert] didn't express opinions regarding DePuy is also contradicted by record.

To extent Magistrate Judge's decision was based on differences between two experts' final reports, the decision is improper. Magistrate didn't, and couldn't, require Appellants restrict expert to present only exact same opinions set forth by previous expert. That would be putting words (or opinions) in expert's mouth and

opening expert up to attack and disqualification regarding basis for his opinions. As District Court in Northern District of Indiana explained, "Although substitute expert's testimony and report are generally restricted to same subject matter as prior expert, substitute isn't normally required to simply adopt prior expert's conclusions verbatim—in effect, doing little more than authenticating and confirming prior expert's conclusions. Rather, substitute expert 'should have opportunity to express his opinions in his own language after reviewing evidence'.. .he will be permitted to review all of evidence, conduct his own independent analysis, and express his opinion in his own words." *Lincoln Nat. Life Ins. Co. v. Transamerica Financial Ins. Co*., 2010 WL 3892860 *2 (N.D. Ind. Sept. 30, 2010). That is what happened in this case. Jarrell reviewed all evidence, conducted his own independent analysis, and expressed his own opinion in his own words within the scope of his retention, which was same as scope of [Disqualified Expert's] retention. Striking of substitute expert because he didn't simply adopt [Disqualified Expert's] opinions was improper.

Merely because Jarrell's opinion differs from or is more detailed than opinions of [Disqualified Expert] doesn't constitute a basis to strike Jarrell's report and opinions regarding DePuy in their entirety, especially where limitations within which newly retained expert was to operate weren't clearly set out prior to his retention.

Here, Appellant's disclosure of Jarrell's opinions regarding DePuy, to extent they were new and, therefore, after disclosure deadline, was clearly justified and, under circumstances, "late" disclosure was harmless. When circumstances are considered based on factors identified by Second Circuit in *Patterson v. Balsamico*,440 F.3d 104,117(2d Cir. 2006), it is clear Magistrate Judge's conclusions and resulting Order were unwarranted and improper.

Appellant explained to Magistrate Judge and repeated same in timely filed objections Appellant timely retained Jarrell well after expert disclosure deadline and didn't know what his opinions were until immediately prior to their disclosure to Appellees. It would've been impossible for Appellant to disclose Jarrell's opinions before disclosure deadline as he wasn't yet retained by that time. Thereafter, Appellant wasn't aware DePuy or Magistrate Judge believed Jarrell was limited to only presenting opinions regarding HOC because order directing Appellants to identify a substitute witness was silent on that point and, therefore, ambiguous at best. Therefore, Appellant was certainly justified in interpreting order as not containing such limitation and believing they were to identify substitute expert to provide opinions regarding both Appellees' products, as [Disqualified Expert] did. Basis for Rouviere's claims, and expert engineer analysis includes impingement between both Defendant's devices, thus requiring a single expert be able to opine on both manufacturer's components and how they

functioned/impinged together.

Although Magistrate Judge found DePuy's failure to disclose its ongoing relationship with [Disqualified Expert] unavailing, Appellants presented evidence raising legitimate concerns about expert's loyalties and DePuy's potential gamesmanship. Delays in disclosing Jarrell's opinions were due to legitimate concerns and misrepresentation by DePuy's counsel. Appellant's reasonable explanation justifies the delayed disclosures, if any. Thus, Appellant's decision not to seek extension for expert disclosure was reasonable given circumstances.

By altogether precluding those opinions and that evidence, Magistrate Judge effectively disposed of Appellant's claims against DePuy or "doomed" Appellant's ability to prove those claims to ultimate fact-finder.

Further, DePuy wouldn't have been prejudiced by allowing Jarrell's opinion and report in its entirety. Expert discovery was ongoing and DePuy had opportunity to take Jarrell's deposition for first time after receiving his report and opinion. No harm no foul![15]

---

[15]Other federal courts have denied a motion to strike expert opinion where initial opinion was incomplete but reply expert opinion raised fact issue. *Altria Client Servs.LLC v. R.J. Reynolds Vapor Co.*, 2022 U.S. Dist. LEXIS 124411(M.D. N.C. 2022)("According to Defendants, not only did Plaintiffs fail to disclose their marking contentions during fact discovery, but their expert opined on marking in his reply report rather than his opening report as was required.   normal prejudice that may arise from failing to include opinions in certain reports doesn't exist. Both parties were able to air their experts' opinions on marking in their respective reports. Each party's motion to strike is denied.");*Hawes v. Macy's Stores West,*

Further, Jarrell's report and opinion didn't necessitate continuance or cause delay in proceedings. Balancing these factors, striking of Appellants' engineer expert opinions regarding DePuy wasn't warranted and striking entirety of Jarrell's opinions regarding DePuy was unduly harsh under circumstances.

Federal appellate courts have affirmed district court striking expert report where "violation isn't harmless if importance of information at issue and its late disclosure cause prejudice to opposing party." *Companhia Energetica Potiguar v. Caterpillar Inc.*,2016 U.S. Dist. LEXIS 201020 (S.D. Fla. 2016)(citing *Mitchell v. Ford Motor Co.*,318 Fed. Appx. 821(11th Cir. 2009)(striking expert report proper where party "didn't properly disclose necessary scientific bases for his expert opinion" under Rule 26, leaving opposing party "unable to depose fully [expert] or question what he relied on to form his opinions");*United States v. Batchelor-Robjohns*, 2005 U.S. Dist. LEXIS 13552, 2005 WL 1761429, at *4 (finding plaintiff's failure to turn over models relied upon by expert wasn't harmless or justified because defendants were prevented from testing reliability of methods used or verify accuracy of expert's opinion).

Further, district courts in this circuit have noted "court has considerable

_____

*Inc.*, 2022 U.S. Dist. LEXIS 11861 (S.D. Oh 2022)("Macy's complaints simply don't rise to level required to exclude expert and strike his report, especially given "rejection of expert testimony is exception, rather than rule.")(citing *In re Scrap Metal*, 527 F.3d 517, 529-30 (6th Cir. 2008)).

discretion" when deciding whether to strike expert's report and "courts generally favor determination of issues on the merits" which is "inconsistent with . . . exclusionary relief." *Lab Crafters, Inc. v. Flow Safe, Inc.,* No. 03-CV-4025, 2007 U.S. Dist. LEXIS 99079, 2007 WL 7034303, at *2 (Oct. 26, 2007); *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc*., 2023 U.S. Dist. LEXIS 61730 (E.D.N.Y. 2023)("regardless of whether Court finds Ramey report is a timely served rebuttal or an untimely served initial expert report, Court finds wholesale preclusion of report is unwarranted based on a weighing of *Softel* factors, particularly due to fact Defendant will suffer no prejudice if Ramey Report is introduced. Indeed, as Plaintiff notes, Defendant was able to depose Ramey and probe any deficiencies in his Report as well as bases upon which he formed his opinions.");*In re Zimmer*, 2021 U.S. Dist. LEXIS 72049, 2021 WL 1405185, at *3 (S.D.N.Y. 2021)("Prejudice can be cured by allowing movant to challenge expert's testimony through depositions…").[16]

---

[16]Other federal district courts excluded expert reports where other party suffered prejudiced or belated disclosure caused need to reopen discovery. *Rekor Sys. Inc. v. Loughlin*, No. 19-CV- 7767, 2022 U.S. Dist. LEXIS 102829, 2022 WL 2063857, at *9(S.D.N.Y. June 8,2022) (excluding untimely expert rebuttal report where allowing its admittance would require court, out of fairness, "to permit [p]laintiff to reopen discovery [and] depose" expert); *Coene v. 3M Co*., 303 F.R.D. 32, 44 (W.D.N.Y. 2014)(excluding expert rebuttal report where, inter alia, defendant did "not ha[ve] an opportunity to depose [expert] concerning his new opinions"). There was no claim by DePuy it was precluded to take deposition of Dr. Jarrell or unable to rebut Dr. Jarrell's report. There was no reasonable basis to strike Dr. Jarrell's report on timeliness grounds. *See:In re Zimmer*, 2021 U.S. Dist. LEXIS

Accordingly, Magistrate Judge's order striking Jarrell's DePuy related opinions and subsequent denial of motion to vacate that order on grounds Appellants failed to present good cause justifying failure to seek an extension of disclosure deadline to present Jarrell's DePuy opinions was erroneous or abuse of discretion and should be overturned.

3.  **Deficient warnings by DePuy proximately caused Rouviere's injuries; granting summary judgment in favor of DePuy was contrary to clearly <u>established law.</u>**

Evidence developed during discovery and record below established by Appellant clearly showed there were material facts in controversy which must be decided by jury, not trial court as done by court below.

Having shown Jarrell's report and opinion shouldn't have been stricken by Magistrate Judge, but rather admitted into record in its entirety, Appellant did provide evidence to create genuine dispute about adequacy of DePuy's warnings proximately causing Rouviere's injuries. Court below noted there was "genuine dispute over whether DePuy's warnings were deficient." When applying Jarrell's report and testimony of Buly, Rouviere provided evidence in support of her two theories of proximate causation of her injuries: *Buly wouldn't have used the DePuy components had he been adequately warned about risk of impingement*. And, *more*

---

72049,2021 WL 1405185,at*6(S.D.N.Y. 2021) (finding that fact a party's "experts didn't get a sur-rebuttal doesn't constitute cognizable prejudice" under *Softel* factors).

*robust warnings by DePuy would've led Buly to give Rouviere more detailed warnings, in which case she wouldn't have consented to surgery.SA-56.*

Buly acknowledged risk of impingement but couldn't anticipate MDM's inherently defective metal-on-metal design. He opposed impingement and warned Rouviere about its consequences. Buly testified he wasn't okay with metal-on-metal impingement and it was to be avoided.*AA-Vol-VIII,p.1828:3-1829:7,p.1830:13-18,p.1856:1-10,p.1857:13-1861:09.* ***Buly wasn't aware MDM/Trident and Summit were designed to impinge and couldn't imagine any designer would want to have impingement in hip system****.AA-Vol-VIII,p.1854:9-1855:11,p.1856:1-10.* Impingement can cause damage metallosis, and negative effects on blood and tissue.*AA-Vol-VIII,p.1856:21-1861:9.* Buly testified impingement design (like MDM's) was in-itself considered reason for revision/failure of a unit.*AA-Vol-II,p.282:23-25.* Buly was unaware of MDM's defective inherent impingement design, lacked Appellees' warning, and therefore couldn't make informed decision.*Id.*

Lower court agreed DePuy's warnings were inadequate and missing related to Rouviere's injuries, impingement, and component mixing/matching. Lack of impingement risk warning to Buly invalidated Rouviere's consent. Buly, unaware of metal-on-metal impingement, didn't see it in surgery, was never warned about it and couldn't warn Rouviere as her intermediary or adjust her component selection.

A reasonable juror could find DePuy failed to adequately warn Buly. *Id.*

Adequate warnings would've prevented Buly from using Appellees' components, influencing Rouviere's decision to decline their use. Rouviere stated she wouldn't have consented to the surgery if she'd known about risks of metal wear and metallosis from the devices. Trident/MDM/stem's design guaranteed metal-on-metal impingement.*AA-Vol-X,p.2414:25-2415:22.*

Rouviere was concerned about metal-on-metal hip implants and asked Buly about risks associated with implant he'd be implanting. Rouviere believed she was having safe/effective alternative implanted to metal-on-metal with ceramic-on-polyethylene dual-mobility on titanium stem construct. She believed this because that is what Buly told her.*AA-Vol-X,p.2238:10-2240:8,p.2414:25-2417:10.* Buly believed this because that is what DePuy told him, and they failed to warn him too. *AA-Vol-VIII,p.1828:3-1830:17;p.1854:9-1855:11;p.1856:1-10;p1856:21-1857:11;p1857:21-1858:18.*

4. **Different/adequate warnings would've led Rouviere's surgeon Dr. Buly not to use or recommend Rouviere use Appellees' hip implants**

Court below held "there's no evidence additional warnings about impingement would've changed Buly's choice of components. Same lack of evidence applies to Buly's choice of warnings. Rouvieres point to no evidence additional warnings from DePuy would've resulted in different conversation between Buly and Rouviere concerning risks of impingement."*SA-57*. This finding

of fact is clearly erroneous as record demonstrates to the contrary:

- Buly was unaware Rouviere's implant had unavoidable impingement due to defective metal-on-metal design of MDM, Trident shell, and Summit stem.*AA-Vol-VIII,p.1854:9-1855:11,1856:1-10.*

- Buly testified he'd be surprised at manufacturer designing for impingement and couldn't imagine any designer wanting more impingement in hip system.*AA-Vol-VIII,p.1854:9-1855:11.*

- Buly testified metal-on-metal impingement disperses metal flakes and ions into body, causing metallosis and adverse effects on blood, tissue, and overall health. It should be avoided. *AA-Vol-VIII,p.1857:13-1861:09.*

- Buly didn't anticipate same risks associated with metal-on-metal impingement due to MDM design in ceramic-on-polyethylene on titanium stem dual-mobility hip construct used in Rouviere.*AA-Vol-VIII,p.1828:17-1830:17.*

- Buly assured Rouviere she'd be safe from metallosis risks typically associated with metal-on-metal implants because she was receiving "ceramic-on-polyethylene" construct.*AA-Vol-VIII,p.1795:1-15,p.1828:3-1829:7.*

- Buly testified he had limited knowledge of metallosis, only associated with metal-on-metal implants. DePuy sales representative never informed him about it.*AA-Vol-II,p.416:11-418:5.*

- Buly testified impingement can generate titanium debris, triggering body reaction, potentially causing metallosis.*AA-Vol-II,p.285:20-287:1;AA-Vol-VIII,p.1860:8-11.*

- Buly was unequivocally clear he wasn't okay with metal-on-metal impingement in a system, and it was something to be avoided.*AA-Vol-VIII,p.1854:9-p.1856:10.*

Buly's clear testimony contradicted district court's finding presented in

summary judgment proceedings below, that he'd have used DePuy's devices

regardless of warnings. It was erroneous to conclude Buly would've still recommended DePuy's devices had he known about the metal-on-metal impingement design.

Buly trusted FDA approval, unaware DePuy lacked it and misrepresented its devices as FDA-approved. DePuy sales and corporate representatives falsely denied FDA clearance for Summit Duofix+Biolox pairing was required.*AA-Vol-IV,p.722:12-19,p.723:7-724:2,p.725:22-728:20;AA-Vol-VIII,p.1795:1-15,p.1809:7-11,p.1817:17-23;p.1824:16-1825:13;p.1911:8-12;p.1816:21-1819:6;AA-Vol-III,p.654:14-659:09; ECF-233,p.9,p.DEPUY_ROUVIERE_0000002, DEPUY_ROUVIERE_00005073-5085 (Under-Seal),).*[17] Buly wasn't aware the devices lacked FDA approval, or he wouldn't have used them in Rouviere.*AA-Vol-VIII,p.1817:17-23,p.1824:16-1825:19, ECF233,p.9, p.DEPUY_ROUVIERE _0000002,00005073-5085 (Under-Seal),.*

---

[17]Appellant cited evidence DePuy devices implanted in Rouviere weren't FDA approved, making Buly's reliance on approval mistaken. DePuy's products placed into Rouviere, Summit DuoFix stem and Ceramic head weren't cleared for compatibility in 2012.*AA-Vol-III,p.654:14-659:09; Supp-A,Vol-III,p.700:21-703:0, ECF 233,p.9, p.DEPUY_ROUVIERE_0000002, DEPUY_ROUVIERE_ 00005073-5085 ,(Under-Seal)..* Summit's Duofix coating in 2012 didn't have legal FDA clearance/marketing approval lacking legal predicate in Triflange.*AA-Vol-X,p,2454-2455 .* DePuy didn't warn Buly the components were fraudulently or not cleared. Buly's decision to use the DePuy components was based on his belief they were legally cleared by FDA. Buly wouldn't have used/prescribed them otherwise.

Further, ***Rouviere stated she'd never allow any device be placed in her that had/caused metal wear/debris***.*AA-Vol-X,p.2414:25-2417:10.* Yet, court below erroneously found to contrary.*SA-57-fn.8.*

The court found neither Buly nor Rouviere affirmatively said they wouldn't use Summit Stem with same material specifications construing their silence as to say they would. What court omits is Buly and Rouviere's willingness to use Depuy components, based on chemical composition as stand-alone products isn't relevant here. Appellant's case focuses on dangerous/unapproved pairing of Stryker/ Depuy's devices causing metal-on-metal impingement and excessive metal wear debris leading to metallosis. ***DePuy was aware of risks and encouraged sales of stems after Stryker's devices' impingement caused system failures***.*AA-Vol-IV,p.891.*

Appellant's and Buly's testimony support they'd avoid using DePuy's stem with Stryker's ADM/MDM/Trident Shell due to risks of impingement and metal wear debris. Court's reliance on only specific metal content of DePuy's stem is improper and irrelevant here. Buly and Rouviere were clear they weren't expecting, or okay with metallosis risks from metal-on-metal which applies to all metals, including DePuy's titanium stem when paired with Stryker's impingement-based components. Metal-on-metal impingement and metal wear are something Buly and Rouviere would've avoided.

DePuy didn't advise surgeons, their customer, they lacked approval to pair their Summit Duofix Stem with Biolox Ceramic Head.*AA-Vol-IV,p.722:12-725:12;AA-Vol-VIII,p.1795:1-15;p1809:7-1810:8;p1817:17-23;p1824:16-1825:13;p1828:3-1829:7.*

Summit's Duofix femoral stem's coating in 2012 didn't have legal FDA clearance/marketing approval and lacked a legal predicate in Triflange acetabular shell(K001277).*AA-Vol-X,p.2454-2455.* Specific coating information required by FDA was missing. Triflange's HA/porous coating served as predicate device with incomplete/lacking coating information, making it difficult for FDA to assess its true equivalence(K001277, *ECF346-20 (FDA Stryker recall letter 346-2 (Sealed Document); See also:*

*https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?id=K001277* .

DePuy's sales representative falsely testified DePuy only allowed FDA-approved devices and pairing Biolox head/Summit Duofix stem in August 2012 was FDA-approved construct.*AA-Vol-IV,p725:22-728:20.*

DePuy's corporate representative testified no legal FDA clearance existed for DePuy Summit Duofix's compatibility with Biolox head and approval wasn't required.*AA-Vol-III,p.654:14-659:09;Supp-A,Vol-III,p.700:21-703:22.* But FDA required that approval.

Having developed above factual record below, court below findings of fact

and conclusions of law regarding failure to warn claims were clearly erroneous.

## POINT II

## DISTRICT COURT ERRED IN GRANTING STRYKER'S MOTION FOR SUMMARY JUDGMENT

Appellant submits court below erred in finding SOL barred Appellant's claims against Stryker, and then granting summary judgment in favor of Stryker. Heart of Appellant's claims is impingement of devices and resulting friction caused release of excessive metal debris and ions that, in turn, resulted in metallosis and other conditions causing pain, swelling, inflammation, adverse tissue reactions, and decreased range of motion.*AA-Vol-I,p139¶¶126–28;AA-Vol-III,p587*. Rouviere complained not of physical pain or discomfort resulting from implantation, but of condition she developed as result of exposure to toxic metal debris from devices. Rouviere's injuries thus allegedly resulted from exposure to toxic substance, not merely mechanical problem: "Plaintiffs claim DePuy titanium stem impinged with Stryker cobalt-chrome liner, releasing toxic metals into Rouviere's body, which, in turn and over time, caused various ailments in Rouviere."*SA-72;AA-Vol-X,p.2499*. These allegations, as supported by evidence and record in this case, are precisely type with which New York legislature was concerned when it passed C.P.L.R. 214- c(2).*SA-72;*

**1.  Appellant's claims are not time-barred by New York's 3-year personal injury SOL.**

Court below determined symptoms experienced by Rouviere were consequence of defective design and metallosis, but not the cause of its discovery, and symptoms Rouviere experienced prior to May 2015 were attributed to impingement, leading to excessive wear debris and latent development of main condition of metallosis. But then court below asserted they were symptoms that should start her SOL for discovery of her metallosis.

Definition of 214 c(2) is notwithstanding provisions of section 214, three-year period within which action to recover damages for personal injury or injury to property caused by latent effects of exposure to any substance or combination of substances, in any form, upon or within body must be commenced shall be computed from date of discovery of injury by plaintiff or from date when through exercise of reasonable diligence such injury should've been discovered by Plaintiff, whichever is earlier.

Accordingly, Rouviere 's claims were plead in that metallosis had to occur first before symptoms of pain, swelling, inflammation, adverse tissue reactions, and decreased range of motion could follow, and her injuries thus allegedly resulted from exposure to toxic substance, not merely mechanical problems. These allegations, if true, are precisely type with which New York legislature was concerned when it passed C.P.L.R. 214-c(2).*SA-72.*

Rouviere 's mechanical symptoms, including limited range of motion, pain, and instability, were caused by faulty impingement design of MDM liner and her pre-existing condition of EDS, but weren't symptoms of her main condition of tissue metallosis and cannot be used to trigger SOL.

Court below agreed Rouviere suffered from mechanical symptoms which weren't main claimed injury, and metallosis was main claimed injury.*SA,p.71-72.* Main issue isn't failure of device, but detection of metallosis before 2016. Instability, limited range of motion and related consequences, including pain, weren't pathological or manifested symptoms related to earlier identification of Rouviere's metallosis.[18]

Court below said Appellant alleged she suffered from "elevated metal levels and instability" prior to revision surgery and experienced "pain and loss of range of motion" by beginning of 2013.*SA,p.73,p.80.* Court below contradictorily concluded, these symptoms weren't key injuries and found Rouviere's main injury was metallosis, caused by release of excessive metal debris.*SA,p.71,p.74.* Implantation of devices alone didn't cause Rouviere's metallosis. Either way, cause of injury isn't the trigger according to CPLR 214 c(2), it's the discovery of

---

[18]Manifestation means…that an individual has been or could reasonably be diagnosed with disease, disorder, or pathological condition by healthcare professional with appropriate training and expertise in field of medicine involved.(29 CFR 1635.3(g).).

main condition, in this case, metallosis.

Considering vast multitude of complaints, related and unrelated, Rouviere made to her medical providers in years before and after her implant surgery, summary judgement must be denied since court below similarly cannot choose among so many competing alternatives. Court below didn't find any specific date on which it can definitively be said Appellant first complained of any symptoms or injuries related to her primary claim of metallosis which would start clock running on SOL. This raises question of fact for jury as to whether claim was timely filed. *See*:*Cergua v. Stryker Corp.*,2012 WL 5506119(S.D.N.Y. 2012).

In 2013, Rouviere's treatment records from osteopath, Dr. Mark Sandhouse, showed she continued to experience hip pain and instability. Appellees selectively presented only post-implant records from Sandhouse, omitting records reporting pain and instability throughout Rouviere's body and in her hip before 2012 implant, due to EDS.*AA-Vol-XI,p.2714¶3.*

In April 2013, Buly confirmed Rouviere's implant stability, absence of metallosis signs, and overall well-being.*AA-Vol-II,p.353:14-355:10;p.397:5-7,p.398:10-399:4*. Alvarado testified in 2015 Rouviere's chronic hip pain, laxity, and instability were attributed to EDS, and there were no diagnostic indications of implant failure. Alvarado stated her slightly elevated chromium level was normal for a person with hip implant and assured Rouviere her implant wasn't recalled and

not typically associated with metallosis, if MDM liner was properly seated, which it was.*AA-Vol-III,p.479:1-13,p.480:2-18.*

In August 2016, Rouviere experienced increased instability, pain, and loss of hip function, leading to closed reduction surgery. X-ray revealed impingement gouge on stem, but Alvarado wasn't concerned, assuming it was polyethylene impingement with ADM insert, not metal-on-metal with chromium- cobalt MDM liner. He was unaware of ADM/MDM recall for excessive debris causing metallosis and assured Rouviere they hadn't been recalled.*AA-Vol-III,p.482:13-17,p.483:2-5. AA-Vol-III,p.486:2-489:16;p.490:7-491:5;p.534:6-14.* Three-months later, Rouviere was officially diagnosed with metallosis during open exploratory surgery.*AA-Vol-III,p.520:11-521:2.*

This case was ill-suited for resolution at summary judgment as Rouviere has had long and complex history of medical conditions and injuries, even prior to 2012 hip surgery at issue, making it impossible to state as matter of law, any one injury was resultant from malfunction or defect of device."*AA-Vol-XI,p.2549.* Ailments Rouviere complained of "back in 2012-2015 are subject to interpretation since Appellees' own experts attribute these ailments in various body parts to connective tissue disorder, generally genetic in nature".*AA-Vol-XI,p.2555.*

It's clear court below mis-defined Rouviere's main condition of "metallosis", and therefore, its findings of fact are clearly erroneous. Court below

acknowledged metallosis as primary condition, but couldn't properly define what metallosis was, or identify any symptoms of metallosis exhibited before its visual observation. "Metallosis" is tissue response to metal wear debris, identified in surrounding tissue of decomposing implants, only identifiable by open surgery and visible identification, and usually accompanied by tissue destruction, bone necrosis, and systemic induction of metal ions generated from metal wear debris.

No symptoms of metallosis are known to exist and it can be asymptomatic until visually determined. Rouviere and her doctors didn't discover any symptoms of metallosis before its visual determination in her hip tissue in November 2016 and her experts haven't asserted otherwise. Court below used proposed mechanical symptoms resultant from impingement, and random unrelated symptoms selected to attempt to indicate her toxic metal exposure, holding they should've led her to discover her metallosis before November 2016. Symptoms of metal toxicity, not defined, would be secondary to Rouviere's main condition of metallosis.[19]

New York's "toxic tort SOL," N.Y. CPLR 214-c(2) states three-year limitations period for personal injury actions doesn't begin to run, in cases of latent effects of exposure, until date on which injury is or reasonably should've been

---

[19]Gannon, Rouviere's expert pathologist, opined systemic exposure happens secondarily after local tissue exposure.*AA-Vol-IV,p.897,p.901;AA-Vol-VIII,p.1769:118:6-11,p1772:133:2-8.*

discovered.  Discovery rule applies in cases of injury caused by "latent effects of exposure to any substance * * * upon or within body"(CPLR 214-c[2]). "Exposure is defined as 'direct or indirect exposure by absorption, contact, ingestion, inhalation or injection'(CPLR 214-c[1]). Implicit in this language is notion some contact with substance is essential to cause of action, an element lacking here." *Enright v. Eli Lilly & Co.*,77 N.Y.2d 377,385(1991).

As this Court has explained:

> For purposes of CPLR§214-c, claim for latent personal injury accrues "when injured party discovers primary condition on which claim is based."*Matter of New York County DES Litigation*, 89 N.Y.2d506,509,655 N.Y.S.2d862,863,678 N.E.2d474(1997).Fact there may be delay before " connection between th[e] symptoms and injured's exposure to toxic substance is recognized" doesn't delay start of limitations period. *Id*. Nor does worsening of plaintiff's symptoms over time alter or postpone accrual date. *See:e.g.,Whitney v. Quaker Chemical Corp*., 90 N.Y.2d845,847,660, N.Y.S.2d862,863,683 N.E.2d768(1997)(mem.)."All that's necessary to start limitations period [of 214-c(2)] is plaintiff be aware of primary condition for which damages are sought." *Id*.;*see:e.g.,Tarazi v. Exxon Corp*., 269 A.D.2d 385,386,703 N.Y.S.2d 205, 206 (2d Dep't) (mem.), lv. denied,95 N.Y.2d 755, 711 N.Y.S.2d 833, 733 N.E.2d 1102(2000).

*Bano v. Union Carbide Corp*.,361 F.3d 696(2d Cir. 2004)(alterations in original). "[C]ourts have held cause of action accrues at moment plaintiff begins to experience symptoms reasonable person would link with underlying illness. *See:e.g.,Prego v. City of New York*, 141 Misc.2d 709,712,534 N.Y.S.2d 95(1988). Thus, once plaintiff becomes aware-through whatever means-of primary condition he's suffering, statute begins to run."*Styles v. Goord*,367 F. Supp.2d

473,475(W.D.N.Y. 2005). New York Court of Appeals has "rejected contention plaintiff must also discover injury has nonbiological cause."*Whitney v. Quaker Chemical Corp.*,90 N.Y.2d 845,847,683 N.E.2d 768,660 N.Y.S.2d 862(1997)(*citing Matter of New York County DES Litig.*,89 N.Y.2d 506, 655 N.Y.S.2d 862, 678 N.E.2d 474). "Discovery of cause of symptoms isn't relevant…" *Scheidel v. A.C. & S., Inc.*,258A.D.2d 751,753,685 N.Y.S.2d 829(3d Dept. 1999).

"Accrual occurs upon manifestation of symptoms of condition which is basis of claim, not upon formal conclusive diagnosis of that condition." *Levine v. Philip Morris, Inc.*, 5 Misc.3d 1004(A),798 N.Y.S.2d 710(Table),2004 WL 2334287(Sup. Ct. New York County 2004); *see also:Martin v. 159 West 80 Street Corp.*, 3 A.D.3d 439,440,770 N.Y.S.2d 720(1st Dep't 2004)(" three-year SOL of CPLR 214-c(2) runs from time plaintiff discovers an injury, that is, from time she realizes she has physical manifestations of illness. "); *Scheidel*, 258 A.D.2d at 753(SOL began to run upon manifestation of symptoms, even though plaintiff may not have had formal diagnosis of asbestosis until later); *Krogmann v. Glens Falls City School Dist.*, 231 A.D.2d 76, 78, 661 N.Y.S.2d 82 (3d Dep't 1997)("To hold otherwise-- essentially tolling limitations period until plaintiff's physician eventually diagnosed her condition--would allow date on which claim accrues to 'depend on such fortuitous circumstances as diagnostic acuity of[injured party's] chosen physician', a result explicitly rejected in *Wetherill v Eli Lilly & Co.*,[89 N.Y.2d 506, 678

N.E.2d 474, 655 N.Y.S.2d 862 (1997)]").

Here, Rouviere suffered a plethora of medical problems generating symptoms of dizziness, vertigo, palpitations, chronic fatigue, memory loss, nausea, headaches, weakness, cognitive impairment, tachycardia, and dry eyes/blurred vision. In 2013, Rouviere suffered cervical dislocation necessitating emergency cervical surgery. It was unsuccessful, leaving her cervical spine unstable and leading to severe and debilitating neurological symptoms. She saw extreme decline in health/function and sought out neurosurgeons/neurologists for opinions from 2013-2015.*AA-Vol-V,p.1004-1018,p.1021-1053;AA-Vol-XI;p.2607-2609.*

Metallosis, typically asymptomatic, was discovered during Alvarado's surgery. Rouviere had no way of knowing about the damaging effects of metal debris saturation and the tearing on her tendons and muscles before symptoms became evident during surgery.

To suggest moment Rouviere experienced headaches, chronic fatigue, memory loss, nausea, weakness, cognitive impairment, tachycardia, dry eyes/blurred vision, she was alerted she had metallosis would be disingenuous by any judicial yardstick.

It's absurd to expect any of these symptoms should've alerted Rouviere to her metallosis from 2012-2015. For that reason, in cases just like Rouviere's, courts would often apply New York's second injury rule: "diseases that share

common cause may nonetheless be held separate and distinct where their

biological manifestations are different and where presence of one isn't necessarily

predicate for other's development." *Braune v. Abbott Lab*. 895 F. Supp. 530

(E.D.N.Y. 1995).[20] District court below erred in finding Appellant's action wasn't

commenced timely pursuant to CPLR 214-c(2), given clearly established law and

trial record below.

Given complexity of all symptoms and illnesses Rouviere suffered prior to

and after 2012 hip surgery, proper resolution here is for jury to decide date

Rouviere constructively discovered her injury. *Braune*,895 F. Supp. At 556

("Statutes of limitations problems raised in complex cases such as instant one often

---

[20]New York rule requiring jury determination for many section 214-c issues has particular force in federal suit. In federal court, Constitution protects right to jury trial, U.S.Const. amend.VII("In Suits at common law . . . right of trial by jury shall be preserved. ........................................................................................ "), and "federal policy favor[s] jury decisions of disputed fact[s]."*Byrd v. Blue Ridge Rural Elec. Coop*., 356U.S. 525,538,78 S. Ct. 893, 901, 2 L.Ed.2d 953(1958);see also:*Simler v. Conner*,372U.S. 221,222,83 S. Ct. 609,610-11, 9 L.Ed.2d 691(1963)("federal policy favoring jury trials is of historic and continuing strength.");*9Charles Alan Wright Arthur R. Miller*, Federal Practice and Procedure §2302.1,at 24(1995) ("[T]here is a strong federal policy favoring trial by jury of issues of fact.");cf. *Chauffeurs, Teamsters-Helpers, Local-No.391 v. Terry*, 494U.S. 558, 565, 110 S. Ct. 1339,1344-45,108 L.Ed.2d 519(1990)("`"Maintenance of jury as factfinding body is of such importance and occupies so firm a place in our history and jurisprudence that any curtailment of right to jury trial should be scrutinized with utmost care."'"(quoting *Dimick v. Schiedt*, 293 U.S.474,486,55 S. Ct. 296,301,79 L. Ed. 603(1935). Court explained: Federal system is independent system for administering justice to litigants who properly invoke its jurisdiction.

present factual disputes appropriate for jury resolution. It's settled, for example,

date plaintiff constructively discovered his 'injury' is mixed question of fact and

law to be determined by jury.").*Houston v. Cotter*, 7 F. Supp. 3d 283, 2014 U.S.

Dist. LEXIS 41434; *Scherrer v. Time Equities,* 218 A.D.2d 116, *116; 634

N.Y.S.2d 680, 680; 1995 N.Y. App. Div. LEXIS 12617(held whether there existed

facts which should've led either plaintiff to conclude, at earlier date, subject

exposure to toxic fumes resulted in injury was matter requiring discovery and

question to be resolved by trier of fact).

**2. District court erred Appellees shouldn't be equitably estopped from claiming action was untimely due to its egregious and extreme fraudulent misrepresentations about nature of its product by Appellees**

As noted by Mr. Justice Earle C. Bastow in *Erbe v Lincoln Rochester Trust Co.*

(13 AD2d 211, 213, mot-for-rearg-and-mot-for-lv-to-app-den 14 AD2d 509, app-

dsmd 11 NY2d 754):"Fraudulent representations may play dual role. They may be

basis for independent action for fraud. They may also, in equity, be basis for

equitable estoppel barring defendants from invoking SOL as against cause of

action for breach of fiduciary relations." It's rule defendant may be estopped to

plead SOL where plaintiff was induced by fraud, misrepresentations or deception

to refrain from filing timely action. *General Stencils v Chiappa*, 18 NY2d 125;

*Erbe*, 13 AD2d 211, mot for rearg and mot for lv to app den 14 AD2d 509, app-

dsmd 11 NY2d 754, *supra*; *Fraud, Misrepresentation, or Deception as Estopping*

*Reliance on SOL*, Ann., 43 ALR3d 429. Allegations of Rouviere's complaint bring Appellant within shelter of this rule. Elements of reliance by Appellant on alleged misrepresentations as cause of her failure sooner to institute action for metallosis and of justification for such reliance, both necessarily to be established by her, are sufficiently pleaded within fair intendment of allegations of her complaint.

Stryker should be estopped from relying on SOL as defense; they misrepresented facts to FDA and physicians using their implant and altered filings to present this product as ceramic-on-polyethylene without metal-on-metal impingement.*Supp-A,Vol-I,p.178:23-179:3,p.201:22-202:8; ECF345-16, bates no. STRROUV00000144 (SEALED DOCUMENTS),.*

The amount of documentation Stryker altered, misrepresented, and failed to inform FDA about would be endless indictment in these papers; one unnecessary to meet Plaintiff's burden of showing Defendant's actions prevented her from filing her complaint sooner.

Stryker's misrepresentations delayed Rouviere from taking legal action earlier. Buly wouldn't have chosen Appellees' devices if he'd known their usage would lead to metal-on-metal impingement and excessive metal wear debris under normal and foreseeable conditions.*AA-Vol-VIII,p.1854:9-1858:18.*

Buly and Alvarado testified being unaware of Rouviere's components' recalls. Buly testified he wouldn't use recalled devices. In 2015, Alvarado assured

Rouviere her devices weren't recalled and posed no metallosis concerns.*AA-Vol-II,p.357:18-358:22,p.361:14-362:1;AA-Vol-III,p.482:13-17,p.483:2-6.*

Stryker's Instructions for Use ("IFU") for Rouviere's devices, no warnings existed related to their use and elevated metal ion levels in blood. In 2012, Buly had seen the IFU and had no reason to believe that risk existed.*AA-Vol-II,p.289:18-291:7,p.364:25-365:19.* But, in 2016, Stryker added this warning to exact devices in relevant IFU**.** *ECF-345-16,p.1-10;ECF-345-17 bates no's STRROUV00013762-72 (SEALED-DOCUMENTS),.* Stryker misrepresented warnings and Rouviere received implants Buly would never have used if he knew true risks.

Stryker deliberately removed warnings from relevant 2012 MDM/ADM-X3 Surgical Technique present in 2009 ADM Surgical Technique. These warnings related to risks of metal impingement with Trident hemispherical shell and metallosis. *ECF345-16 bates no's STRROUV00000112, STRROUV000000129-152 (SEALED-DOCUMENTS),,ECF345-17,bates no STRROUV00007608 (SEALED-DOCUMENTS).*

Buly checked blood ion levels for symptomatic patients only with metal-on-metal articulations. He testified same risks, metal toxicity and metallosis, didn't exist for, and he didn't test with, ceramic-on-polyethylene implants like Rouviere's.*AA-Vol-VIII,p.1828:14-1829:7.* Buly testified with ceramic, not cobalt-chrome, head he wasn't aware of ions shed into body.*Id.* Alvarado also testified

MDM wasn't known to be associated with metallosis in 2015, and in 2016 he expected impingement was occurring with the polyethylene-ADM insert, not the cobalt-chromium-MDM liner.*AA-Vol III,p.480:9-18;p.491:13-493:10;p.534:6-14.* Testimony of Rouviere's surgeons unequivocally demonstrates they were, and still are, deliberately being in dark kept regarding known risks and expected metal-on metal-impingement of MDM/Trident/metal stem and therefore, couldn't treat Rouviere effectively and timely, causing her more severe injuries and preventing her from filing her claim earlier.

MDM's Surgical Technique, IFU and 510(K) don't match. This is how Stryker got component through FDA process by essentially playing third card Monty and hiding MDM liner behind older different components.

Stryker falsely presented the ADM shell as the approved/compatible shell for the ADM insert. *ECF-345-16(Exh.16 bates no's STRROUV00000629 (SEALED-DOCUMENT).* However, in 2012, MDM/ADM-X3 Surgical Technique instructed surgeons combine ADM insert/MDM liner, and Trident, not ADM, shell. *ECF-345-16(Exh.16- bates no's STRROUV0000129-152:131 (SEALED-DOCUMENT).* Stryker only presented Trident shell to FDA and in Surgical Technique as the compatible shell for the MDM. *ECF-345-16(Exh.16-bates no's.STRROUV00000906-907 (SEALED-DOCUMENTS)).* There was no IFU for combination of ADM/MDM/Trident shell, despite MDM's Surgical Technique's

instructions. *ECF-345-16(Exh.16-bates no's STRROUV00000001-10 (SEALED-DOCUMENTS)).* IFU for ADM/MDM instructed surgeons to pair it with ADM shell, while Surgical Technique for MDM paired with Trident shell. *ECF-345-16(Exh.16- bates no's STRROUV00000001-108:5-6,STRROUV000000129-152:131 (SEALED-DOCUMENTS)).* As result, there was no FDA clearance or warnings for compatibility of these three components as instructed by Stryker.

Stryker presented MDM liner to FDA as substantially equivalent to ADM shell to gain 510(K)clearance. Shell is affixed to acetabulum. MDM liner sits within shell. Complexity of process is what Stryker counted on to get MDM to market as fast as possible without PMA process/application required. Stryker's lies and misrepresentations made it impossible for physicians requiring warnings to know risks.

MDM liner wasn't acetabular shell as Stryker represented to FDA to gain fast 510k clearance. As per Stryker's definition, MDM "Acetabular shell" was part of the outer-portion of acetabular prosthesis, fixed to pelvis with bone cement and/or fixation devices. But MDM "liner" was part of the *inner*-portion of the acetabular prosthesis, *not* fixed to pelvis with bone cement and/or fixation devices, but locked into Trident "acetabular shell" using Trident locking mechanism. Trident shell was the "acetabular shell" fixated to the pelvis. Stryker also misrepresented MDM was part of **two- piece**, not **three-piece** acetabular system to FDA. *ECF345-16(Exh.16*

*bates no's STRROUV00000895,STRROUV0000902, STRROUV0000904 (SEALED-DOCUMENTS))*

*See also:https://www.hipaaspace.com/medical_billing/coding/global.unique. medical.device.identification/04546540666017 .*

In fact, Buly and Alvarado didn't think what occurred to Rouviere's implant was possible based on Stryker's representations. Stryker deceived FDA by not clearing ADM insert to articulate with MDM liner. This was Stryker's avoidance of the 5-year PMA-process and their way to get their untested and new cobalt-chromium impingement liner, first to market, in turn, misinforming surgeons in the relevant IFUs and Surgical Techniques, the only product references and warnings provided to them. As such, Stryker's deceit and misrepresentations also prevented Rouviere from learning true risks associated with her device and of her injury and preventing her from filing her complaint sooner.

In August 2012, open recalls existed for all of Stryker's components implanted into Rouviere. Stryker didn't properly inform Rouviere's physicians or public of ADM, MDM and Trident's recalls, and didn't remedy issues recall's subject; the same severe consequences Rouviere suffered from with devices' use.

Documentation Rouviere obtained through FOIA request showed her ADM insert and MDM liner were part of an open recall in August 2012,(Opened 2011-

closed 2014). *ECF345-16(Exh.16 bates no. STRROUV00000625 ,Exh.19,Exh.20, Exh.21,Exh.22 SEALED-DOCUMENTS)).*

Recalled products were identified by Stryker in their recall as the products placed in Rouviere in 2012.[21] *ECF-345-16,bates no's STRROUV00001305,ECF-342,p.40;ECF-346-17,bates no. STRROUV00008134 (SEALED-DOCUMENTS),.* Cobalt-chromium MDM liner was a component on recall, not only polyethylene-ADM insert. Above documents establish Stryker only gave warning in recalls relating to increased polyethylene debris from ADM insert leading to revision surgery, and, once again, gave no warning about risks for cobalt-chromium debris from MDM liner, which presented even more serious risks of metal wear debris.

Further, Stryker reported to FDA,100% of Stryker's Branches/Agencies responded to notice upon closing recall in 2014, yet Stryker's corporate representative testified there'd been no recalls for Rouviere's devices. *SA-Vol-I,p.47:23-48:1,p.57:23-25;p.63:19-64:10;p.65:10-70:14);ECF-346-20,346-21,FDA Stryker recall letters (Sealed Documents).*

Stryker knew of issues with Trident shell; it too was on recall that didn't close until after Rouviere was implanted with it.(Z-1171-2008 Class 2 Device

---

[21]Stryker's corporate representative falsely asserted there weren't recalls on Rouviere's devices and Rouviere's lot-specific number was checked. But recall didn't specify lot numbers. "**All lots**" was listed in recall that ran 2011-2014. *Supp-A-Vol-I,p.47:23-48:1,p.57:23-25;p.63:19-64:10;p.65:10-70:14).*

Recall Trident). Trident shell had a hemispherical design increasing the risk of femoral- neck impingement, known to cause pain, lead to metallosis and early construct failure, just like Rouviere's did.*See also, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=68172 , ECF-345- 16 bates no's STRROUV00000117, STRROUV00000005-6, STRROUV00000686-87,ECF-341,p.30,ECF-345-17, bates no's STRROUV00007646,STRROUV00013766,ECF-41,p.11;ECF-345-17, bates no's STRROUV00007608, STRROUV00007613-14.STRROUV00008134 (SEALED-DOCUMENTS,.*

Buly depended on FDA's approval for safety/efficacy of the implants he used in his patients.*AA-Vol-VIII,p.1795:1-15,p.1809:7-11,p.1817:17-23,p.1911:8-12.* Buly testified if he'd been aware of recall, he wouldn't have implanted that component into Rouviere.*AA-Vol-VIII,p.1842:17-1843:09.* Buly thought Rouviere's components hadn't had recalls.*AA-Vol-VIII,p.1842:17-1843:09.* Alvarado thought Rouviere's components hadn't had recalls.*AA-Vol-III,p,482:13-17,p.483:2-5.*

Appellant alleged Stryker was aware of, and failed to convey, dangers associated with components to her doctors acting as her intermediary and broadly alleged marketing/labeling, including indications/warnings, represented specific implant was safe/effective and appropriate selection for Rouviere. Appellant

61

alleged Stryker continually provided reassurances to her/her surgeons MDM was indicated for high-risk patients like her and was safe/effective.

Stryker had burden of demonstrating absence of genuine issue of material fact. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144,157(1970). There exist genuine material questions of fact as to when primary injury occurred. Stryker's actions are such that Court shouldn't permit them to hide behind obvious misrepresentations/falsehoods presented to physicians regarding medical products placed within humans.

Alternatively, equitable tolling should be applied given above-described acts of Stryker in concealing defects and necessary warnings from Buly, Alvarado, and Rouviere. "To secure equitable tolling, it isn't enough for party to show he experienced extraordinary circumstances. He must further demonstrate those circumstances caused him to miss original filing deadline"*Harper v. Ercole*, 648 F.3d 132, 137(2d Cir. 2011). This Court explained "term 'extraordinary' refers not to uniqueness of party's circumstances, but rather to severity of obstacle impeding compliance with limitations period."*Watson v. United States*, 865 F.3d 123,132(2d Cir. 2017)(citation and alteration omitted). Courts may equitably toll limitations period when, for example, "a defendant fraudulently conceals from a plaintiff fact plaintiff has cause of action, or when plaintiff is induced by defendant to forego lawsuit until SOL has expired."*Mira v. Kingston*,218 F. Supp. 3d 229,236

(S.D.N.Y. 2016)(citing *Pearl v. City of Long Beach*, 296 F.3d 76,82-83(2d Cir. 2002)).

As detailed above, Stryker concealed information its defective device was shedding excessive cobalt-chromium and other metal debris by its design of metal-on-metal impingement from Buly, Alvarado, and Rouviere. Stryker knew Rouviere's injury of metallosis was self-concealing and they kept secret information that would've alerted Rouviere's physicians Appellees' devices were causing excessive metal debris be deposited into her surrounding hip tissue to prevent Rouviere from knowing she was actually injured by Stryker; it was an ongoing fraud, so much so that Alvarado implanted another MDM liner in Rouviere upon her third revision, which, of course, also impinged/failed.*AA-Vol-III,p.550:8-19;p.553:5-10;p.554;3-18.AA-VI,p.1303-1313.*

"Usually when private party is injured, he's immediately aware of that injury and put on notice that his time to sue is running. But when injury is self-concealing, private parties may be unaware they've been harmed."*Gabelli v. SEC*, 568 U.S. 442, 450(2013). In such cases, to commence limitations period at moment of injury would be to reward wrong-doers for their success in keeping injuries hidden from their victims, and to impose on rest of us unrealistic burden of constantly investigating to find out whether we've been injured in some way we hadn't previously realized.*See:Id. at 450-51("Most of us don't live in a state of*

*constant investigation; absent any reason to think we've been injured, we don't typically spend our days looking for evidence that we were lied to or defrauded.").*

The court below held "Plaintiffs' allegations of fraud on behalf of the Defendant … involve misrepresentations made to the community at large and thus are insufficient to justify equitably estopping Defendant from asserting statute of limitations defense."*SA-90.* This holding is contrary to the record. Buly relied on information and IFUs from Stryker and was intentionally misled to prevent Appellant from discovering her injuries caused by Stryker's hazardous and defective devices implanted in Appellant. In cases like this one, other courts would've approved invoking equitable estoppel to toll statute of limitations. See, *Roeder v. J.P Morgan Chase & Co.,* 523 F. Supp. 601, 620 (S.D.N.Y. 2021) (statement to third party may be sufficient to invoke equitable estoppel "if it's directed to plaintiff or intended to frustrate his ability to timely sue"). Buly testified he wouldn't have used the devices had he known they were designed to impinge/cause metallosis. He testified he reviewed IFUs from Stryker, which intentionally omitted hazards and defects of the devices.

Appellant produced above evidence below to prove Stryker misled Buly and Alvarado to induce Appellant to believe there were no hazards/defects with its implants. Under either of the rulings in these two district court decisions, Appellant should've been allowed to toll statute of limitations under equitable estoppel.

*Fisher v. Bristol-Myers Squibb Co.*,181 F.R.D. 365,370 (N.D.Ill.1998)("[S]tep two of the causation battle will require [the plaintiff] to show his physician wouldn't have prescribed Stadol if defendants had provided adequate warnings."), with *Noyola v. Johnson & Johnson*,85 C 2184, 1986 WL 14657, at *4(N.D.Ill. Dec. 16, 1986)("What a physician might or might not have done had he been adequately warned isn't an element plaintiff must prove as a part of her case.")("I need not resolve this issue here because the plaintiffs presented evidence demonstrating that Dr. Byrkit would've acted differently.").

In instant case, record demonstrated fraud was ongoing until 2016. In cases just like this, some state and federal district courts held medical device manufacturers had duty to warn of hazards and defects of its products to physician's patient implanted with defective or hazardous medical devices. *Tresemer v Barke*, 86 Cal App 3d 656)(held that both woman's physician and manufacturer had continuing duty to warn her of its dangers as new hazards were discovered, as long as device physician inserted remained in her body.)

**3.      District court erred in finding Appellant's claims for implied and express <u>warranties were time-barred.</u>**

Appellant described above fraudulent acts, misinformation and/or intentional withholding of information and warnings about their defective devices implanted in Appellant from Appellant and her physicians. For same reasons stated above, Appellant submits SOL should've been tolled regarding her claims for implied and

express warranties against Appellees.

Four-year SOL governs claims that arise under New York's Uniform Commercial Code. *Int'l Design Concepts, LLC v. Saks, Inc.*, 486 F. Supp. 2d 229, 240 (S.D.N.Y. 2007)(citing *N.Y. U.C.C. § 2-725(1)(McKinney's* 1962)). Breach of warranty claim under U.C.C. "is deemed to accrue when delivery is made unless warranty explicitly extends to future performance, in which case it accrues 'when breach is or should've been discovered' (UCC 2-725[2])." *Gianakakos v. Commodore Home Sys.*, 285 A.D.2d at 907 (Supreme Ct. 3d Dept 2001. In this context, "'[t]he term "explicit" has been explained as plain language which is distinctly stated, clear and unequivocal to point that there's no doubt as to its meaning.'"*Port Auth.of N.Y. & N.J. v. Allied Corp*.,914 F. Supp.960,962(S.D.N.Y. 1995)(quotation omitted). Since, "an implied warranty by definition embodies no 'explicit' guarantees . . . [a] plaintiff's . . . implied warranty cause [] of action necessarily accrue[s] as matter of law at about time of tender of delivery ..." *Zielinski v. Alfa-Laval, Inc.,* 1989 WL 29482, at*3(W.D.N.Y. March 27, 1989)(internal citation and footnote omitted). In other words,"[t]he exception to tender of delivery rule--by which accrual would occur at time of discovery of breach of warranty–can't apply because necessary predicate of explicit guarantee of future performance is absent."*Id*.

Breach of express warranties arises under New York's Uniform Commercial

Code, four-year SOL applies. Unless warranty explicitly extends to future performance, breach of warranty claim accrues at time of delivery. *Gianakakos*, 285 A.D.2d at 907. Moreover, because "all warranties in some way apply to future performance of goods, normal four-year limitations period generally isn't extended pursuant to future performance exception unless warranty specifically refers to future time."*Port Auth. of N.Y.& N.J.*,914 F. Supp. at 963(citation omitted).

In most cases which courts have found express warranty explicitly extended to future performance, "warranty specifically made reference to future time, such as 'lifetime' warranty . . . or warranty product would work satisfactorily 'at all times'........."*Holdridge v. Heyer-Schulte Corp. of Santa Barbara*,440 F. Supp.1088,1103 (N.D.N.Y. 1977)(internal citations omitted). However, even when warranty explicitly extends to future performance, immediate failure of goods in question would take case out of that exception. *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 743 (2d Cir. 1979)(footnote omitted). In other words, if "'breach [is] discovered almost immediately upon delivery of machine the SOL, even with regard to "future performance,"[would begin] to run[from time of that initial breach].'"Id. at 743 n.11(quotation omitted).

As stated above, Appellees engaged in conduct to prevent Appellant from knowing she was injured by their defective products and metal shavings from said products being deposited into her tissues. Thus, district court erred in refusing to

toll the SOL to deem Appellant's claims of implied and express warranties timely filed.

**<u>CONCLUSION</u>**

District Court erred in granting summary judgment in favor of Appellees and against Appellant. Further, district court erred in overruling Appellant's objections to order of Magistrate Judge relating to striking certain portions of opinion of Appellant's expert implicating wrongdoing by DePuy. Based on above argument and law, Appellant respectfully submits this Court should vacate district court's orders granting summary judgment in favor of Appellees and against Appellant, and remand case for further proceedings consistent with this Court's opinion.

Respectfully submitted,

*//ss// Jodi Rouviere*
Jodi Rouviere
10950 Southwest 84th Court
Miami, FL 33156-3526
(305)608-8076
jodi.jtm@gmail.com

*Appellant*

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)(7)(C)</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **13,878** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). **However**, the page limitation **exceeds 30 pages** and Appellant requests the Court for leave to exceed the page limitation by separate motion.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

Dated: June 20, 2023

*//ss// Jodi Rouviere*
Jodi Rouviere
10950 Southwest 84th Court
Miami, FL 33156-3526
(305)608-8076
jodi.jtm@gmail.com

*Appearing Pro se*

## CERTIFICATE OF SERVICE

I certify that on June 21, 2023, the foregoing Initial Brief was served on all

parties or their counsel of record through their designated email listed below:

**Paul E. Asfendis, Esq.**
**Kim M. Catullo, Esq.**
One Pennsylvania Plaza, 37th Floor
New York, New York 10119
Tel.: (212) 613-2000
**Email: PAsfendis@gibbonslaw.com**
*Attorneys for Appellee*
*Howmedica Osteonics Corp.*

**Joseph G. Eaton (#15731-29)**
**J.T. Larson (#31392-29)**
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
**Email: joe.eaton@btlaw.com**
**jt.larson@btlaw.com**

*Attorney for Appellee DePuy Orthopaedics, Inc.*

June 21, 2023                    *//ss// Jodi Rouviere*
                                 Jodi Rouviere
                                 10950 Southwest 84th Court
                                 Miami, FL 33156-3526
                                 (305)608-8076
                                 jodi.jtm@gmail.com

                                 *Appearing Pro se*